PRINCE GEORGE'S COUNTRY CLUB, INC. *v.* EDWARD R. CARR, INC.

EDWARD R. CARR, INC. *v.* ABBE ET AL.

[No. 347, September Term, 1963.]

592

594

*Decided July 10, 1964.*

*Motion for rehearing and for stay of mandate filed August 5, 1964, denied September 15, 1964.*

The cause was argued before HENDERSON, PRESCOTT, HORNEY and SYBERT, JJ., and KEATING, J., Associate Judge of the Second Judicial Circuit, specially assigned; and reargued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Hervey G. Machen* (on both arguments) for appellant and cross-appellees.

*Seymour Friedman* (on both arguments), with whom were *H. Max Ammerman* and *Irving A. Levine* on the brief, for appellee and cross-appellant.

HAMMOND, J., delivered the opinion of the Court.

The president and vice-president of the Prince George's Country Club, Inc., a Maryland corporation, having been authorized by the Board to do so, executed on behalf of the Club a purported contract for the sale to Community Builders, Inc., another Maryland corporation, of substantially all of its assets, including one hundred fifty-three acres of land, for a price of $1,300,000. The contract was signed also by the corporate real estate broker which procured the sale, Edw. R. Carr, Inc., the

appellee. Since the sale was of substantially all of the assets of a Maryland corporation the provisions of Code (1957), Art. 23, Secs. 65 and 66 (as to corporate "Consolidation, Merger and other Transfers of Property") were applicable and controlling. Sec. 65 provides that a Maryland corporation having capital stock (as the Club does) "may, in accordance with this subtitle * * * (3) [s]ell, lease, exchange or transfer all, or substantially all, its property and assets * * *." Sec. 66 a provides that every such sale "shall be effected in accordance with the provisions of this section." Subsection (b) requires adoption of a resolution of the board of directors, (1) declaring that the sale is advisable "upon the terms and conditions set forth in a proposed form * * * of articles of sale," and (2) directing that the proposed articles be submitted for the action of the stockholders. Subsection (c) deals with notice of the meeting of stockholders, and subsection (d) states that "[t]he proposed articles shall be approved by the stockholders by the affirmative vote of two-thirds of all the votes entitled to be cast thereon." Subsection (i) provides that "a transfer of property and assets of a corporation of this State, shall be effective when the articles of * * * transfer have been accepted for record by the Commission." The statutory requirements must be met if there is to be an effective sale of all or substantially all the assets of a Maryland stock corporation. *Brune, Maryland Corporation Law and Practice* (Rev. Ed.), Sec. 316.

When the sale of the Club's assets was presented to the stockholders of the Club for approval, the proposal did not receive the affirmative vote of two-thirds of those entitled to vote thereon and, for this reason, the Club returned to the purchaser the $75,000 deposit that had been given to it direct. The broker which had procured the purchaser sued the Club, alleging that it had earned a commission when the contract was signed, and also sued the officers and directors and certain stockholders personally on the theory that they had tortiously interfered with or by misrepresentation induced the contract between the broker and the Club.

The defendants below demurred to all counts. The demurrer to the count against the Club for the commission was overruled, those to the other three counts seeking recovery against the

individuals were sustained. After the trial, at which it was stipulated that the broker had procured a purchaser who was ready, willing and able to perform, Judge Sachse found, contrary to the broker's contention, that the sale was of substantially all the assets of the Club, that the stockholders had not approved the sale as required by Sec. 66 (d) of Art. 23 of the Code, but that the contract was not illegal or void but "at most, ultra vires," and held that, relying on Sec. 124 of Art. 23 of the Code, the broker was entitled to "compensation for the loss or damage" sustained, which he set at the contract figure of $55,-000.

The Club appealed from the judgment for the broker and the broker cross-appealed in an effort to reverse the sustaining of the Club's demurrers to the three counts seeking recovery against the officers and directors individually.

It appears from the record that the Club has one hundred stockholders, each owning one share of stock; that it owned and operated a country club with a golf course, tennis courts, swimming pool, clubhouse and restaurant. There were about six hundred members.

Sometime prior to November 1960, there began consideration of a sale of the Club's real property and a move to a new location. At a stockholders meeting on November 7, 1961, a committee presented two alternatives: (1) the present stockholders could put up more "permanent paid-in capital" or (2) "that the real estate be sold and those who wanted to have a country club in the county start over again at a new location." The committee felt that the better course would be for the present stockholders to take their capital gains from the sale of the land "and those who wanted to retire from the scene could do so, and those who wanted to support a program of finding new real estate and starting over again would be free to proceed in this manner."

At this point the president asked Mr. Lloyd Coates, vice-president of Edw. R. Carr, Inc., the broker (who was not a member or stockholder of the Club but who had been invited to appear), to give advice to the stockholders. Mr. Coates said the value of the Club's land had "enhanced tremendously" in the last five years, that if he were a shareholder he would do

the following: (1) employ a land planner to work with the Park and Planning Commission and the County Commissioners "to find the highest and best use for the property" (an euphemism, obviously, for having it rezoned for the densest possible use) and what this would cost, (2) engage an appraiser, not a member of the Club, to value the property (a) at its current use and (b) at its highest and best use, and (3) employ "a bona fide tax consultant" and "an experienced builder." A stockholder then rose to express his views that the only thing to do was to sell the property so that those who did not wish to join in plans for a new club "could be paid off for their stock and leave."

The fifty-six stockholders present authorized a Committee on Relocation and Reorganization, which had just been created, to formulate a plan for the reorganization and relocation of the Club and to find an appropriate site and report to the January meeting of stockholders.

At the January meeting the Committee reported that the president had, in his name and with his personal funds, acquired an option on a site of four hundred fifty acres, of which three hundred twenty-two acres could be a site for a Club, at Route 301 and Central Avenue, and that the Board unanimously was in favor of the taking over of the option. The chairman of another committee, that of Disposition of Current Property, then suggested that in view of the prospective new site, steps be taken to interest a number of prospective purchasers for the present site, who would then be invited to make bids.

At this point, Mr. Coates was invited once more into the meeting. He revealed that he had an unnamed prospective buyer who would pay over $1,000,000 for the Club's land and assets, other than the golf course equipment, with a down payment of $50,000 "to be placed in escrow upon ratification of agreement."

The minutes of the meeting then say:

> "Since there were many differences of opinion as to the value of the present property, it was impossible to make definite decision on offer at this meeting; therefore, matter of negotiation was turned over to Mr. Green's committee to be handled by them.
>
> "For purposes of clarification, Dr. Brainin asked

that it be pointed out that, in moving the Club to a new location, the present corporation would be completely liquidated, all obligations paid, and a new corporate structure formed for purpose of purchasing the new property."

The president then suggested that those of the present stockholders who were "interested in investing in the acquisition of this 450 acres of land for the purpose of constructing a new country club on 322 acres and using the balance of the acreage for land speculation, pledge a cash amount for the next three years in order that it would be possible to proceed with the purchase."

The president continued: "It was necessary that the President have this information inasmuch as he had a group of five people available who would take this property as a syndicate, in the event the club owners were not interested."

Of the forty-five stockholders present, only twenty-six made pledges.

The meeting then authorized the Green Committee to make decisions and take such action as they deemed advisable for the acquisition of new property and the disposition of current property. (It is stipulated by the appellee that this did not constitute the requisite approval of the stockholders to the sale here in dispute under Code (1957), Art. 23, Secs. 65 and 66.)

The Committee and the Board, after some negotiation approved a sale and the Club, on March 31, 1961, over the signature of its president and vice-president, purported to sell to Community Builders, Inc., the real property described in the contract (153 acres), "forming the Prince George's Country Club,"

"together with all of the improvements situated thereon, and the personal property, including, without limiting the generality thereof, the clubhouse, tennis courts, swimming pool and equipment thereof, and all other structures and improvements, and all of the furniture, furnishings, equipment and tangible personal property now situated on or in said premises, *excluding,* however, the following items: (a) inventories of

food and beverages, (b) supplies, (c) liquor license, (d) golf course equipment consisting of benches, ball-washers, tee markers, cups, flags, hand tools, tractors, mowers, trucks and other golf course maintenance equipment, (e) the sod from all tees, and (f) all of the personal property listed in Exhibit 'B' attached hereto and made a part hereof."

(Schedule B restated and particularized the excepted items and added one or two more. The testimony was and the trial court found that the total value of all excepted items was $20,000.)

The contract next provided:

"This sale is made upon the foregoing and following conditions, namely:" (Only those pertinent here are summarized below)

1. Total purchase price is $1,300,000.
2. Purchase price is to be paid as follows:
   A. Upon signing purchaser is to deposit with seller $75,000 thereof.
   B. On October 1, 1961, April 1, 1962, and October 1, 1962, purchaser is to deposit $75,000 with a named trust company in escrow.
   C. On date of settlement $700,000 additional in cash is to be paid.
   D. Balance of $300,000 is to be paid by a promissory note, payable in annual installments.
4. Seller agrees to file with proper authorities applications for rezoning to Light Industrial of sixty-six acres of the one hundred fifty-three being sold with an option to the purchaser to cancel the contract if the zoning is not obtained by December 31, 1961. Upon cancellation the $75,000 deposit is to be retained by the Club and all other sums paid to the trust company are to be refunded to the purchaser.
8. On agreed date between October 1, 1962, and April 1, 1963, settlement is to be made after

purchaser notifies seller. If purchaser fails to make settlement "the gross amount on deposit with Seller shall be forfeited as liquidated damages and the Purchaser shall be relieved of all further liability hereunder. In the event of forfeiture of the deposit, or in the event of cancellation of the contract by the Purchaser by reason of failure to obtain the Light Industrial zoning of the sixty-six (66) acre parcel hereinbefore mentioned, the Seller shall pay to Edw. R. Carr, Inc., its agent hereunder, Twenty-Five Thousand Dollars ($25,000.00) of said deposit for its services hereunder."

13. Settlement is to be made at office of named title company.

17. "Seller agrees to pay Edw. R. Carr, Inc., its Agent, a commission of Fifty-Five Thousand Dollars ($55,000.00) *at the time of settlement of this contract.* The title company through which settlement of the contract is made is hereby authorized and directed to *deduct said commission from the sale proceeds and to make payment thereof to the Agent."* (Emphasis supplied.)

The Club contends that: (1) the sale was of substantially all its assets; (2) this being so, the parties (meaning, for the purposes of the opinion, the Club and the broker) were on notice of the provisions of Code (1957), Art. 23, Sec. 66, and the effect of those provisions was to make the purported contract of sale no more, in effect, than an offer by the purchaser which the officers of the seller agreed to submit to its stockholders and which could not become a binding contract to pay commissions to the broker until it was so approved; and (3) if the document executed on March 31, 1961, was a contract of the Club, it was a void or illegal contract that would not confer the right to a commission on the broker.

The broker contends that: (1) the sale was not of substantially all of the assets of the Club; (2) if the sale was of substantially all the assets, the agreement in the contract to pay

the broker $55,000 in commission was binding and enforce-
able by the broker (even though the contract could not be spe-
cifically enforced between purchaser and seller) in the absence
of notice to the broker that approval by the stockholders was
required by the statute; and (3) the contract is not void or il-
legal and, if ultra vires, any defense on that score is taken from
the Club by the provisions of Code (1957), Art. 23, Sec. 124.

We do not reach the third contention of either appellant or
appellee for, on the premise that the officers and directors of
the Club had the right to engage a broker to procure an offer
to submit to the stockholders (Cf. *Baumohl v. Columbia Jewelry
Co., 209 Md. 278*), and the right to bind the Club to pay the
broker for the services he rendered, it is our view that a con-
tractual condition, agreed to by the broker, was that its com-
mission was dependent on the approval of the contract of sale
by the stockholders of the Club.

We agree with Judge Sachse that the sale was of substan-
tially all of the assets of the Club. The value of those sold was
$1,300,000, the value of those retained but $20,000. The sale
was of approximately ninety-eight and one-half per cent of all
the assets. It was of all land, and so of the golf course, tennis
courts and swimming pool and of the Club building, and so of
its meeting places and restaurant and bar facilities. The real
charter purpose and actual operation of the selling corporation
was for and as a country club. The sale would have completely
destroyed the appellant as a country club and thus would have
been beyond the power of the corporation to make without
compliance with statutory requirements. *Warren v. Fitzgerald,
189 Md. 476.*

The broker claims that the option which the president of the
Club had obtained on acreage that could be used for a new
country club, and that the Club could have utilized, was an
asset which kept the sale here involved from being a sale of
substantially all the assets of the Club. The contention has more
sound than substance. The president was one of the group of
stockholders who wanted to establish a new club at a new lo-
cation. He was willing to turn over his option to the more ad-
venturous fraction of the existing stockholders or join with
four other entrepreneurs in developing the acreage for resi-

dential uses. It is clear that every probability was that the Club as a corporation would be dissolved and, if the option were to be availed of for the creation of a new club, it would be by individual members of the old Club who had chosen to band together in a new venture. The option was not in any meaningful or pertinent sense an asset of the Club.

The parties agree that the usual rule of law is that where a real estate agent has done all that he was engaged and undertook to do, he has earned his commissions and is not to be deprived of his right to them because the purchaser defaults or because the seller is unable, or unwarrantedly refuses, to consummate the sale. The rule has been declared by the Legislature by Code (1957), Art. 2, Sec. 17, which provides:

> "Whenever, in the absence of a special agreement to the contrary, a real estate broker employed to sell * * * real or leasehold estates * * * procures in good faith a purchaser * * * and the person so procured is accepted as such by the employer, and enters into a valid, binding and enforceable written contract of sale * * * in terms acceptable to the employer, and such contract is accepted by the employer and signed by him, the broker shall be deemed to have earned the customary or agreed commission."

The statute is not applicable here because (passing the questions of whether the contract here was "a valid, binding and enforceable written contract of sale" and whether such a contract was "accepted by the employer," the Club, since the stockholders did not approve it), the condition of "the absence of a special agreement to the contrary" which makes the statute operative, was not met. If there is a special agreement the statute does not apply. *Chasanow v. Willcox,* 220 Md. 171. The Municipal Court of Appeals for the District of Columbia, interpreting Maryland law, held that where, as in the case before us, the broker signs the contract, his rights are fixed by special agreement and not by the statute. *Dal Maso v. Gregory,* 112 A. 2d 923.

The rule underlying the statute does not apply because the contract which the broker signed made the consummation of the sale a condition precedent to the earning of the broker's com-

missions. *Borowski v. Meyers,* 195 Md. 226, 232-233, after re-iterating the usual rule, held:

> "On the other hand, a broker is not entitled to commission if he has not completed the undertaking which he assumed. The essence of a brokerage commission is that it is dependent upon success, and that it is not dependent in any way upon the amount of work done by the broker * * *.
>
> "So, where consummation of a sale is dependent upon a condition, the principal's agreement to pay a commission to the broker is dependent upon the stipulated contingency; and if the broker acquiesces in the arrangement, and reasonable and bona fide efforts are made by the principal to perform the condition, but the efforts are unsuccessful, the broker is not entitled to a commission."

(In *Borowski* the contract required, lest it be void, that the business being sold gross $1,000 a week for a stipulated period.)

The contract before us gives many inherent indications that the broker's right to a commission was subject to the condition precedent that the sale be consummated. It provided: "This sale is made upon * * * the *following conditions,* namely" (emphasis added), and among these conditions were:

> 1. Settlement was to be made at a time to be made certain, at a specified place.
> 2. If the purchaser failed to settle, the $75,000 deposit (which the Club was paid direct) was forfeited "as liquidated damages" and the purchaser had no further liability; it was further agreed that "[i]n the event of forfeiture of the deposit, or in the event of cancellation of the contract by the Purchaser by reason of failure to obtain the Light Industrial zoning of the sixty-six (66) acre parcel hereinbefore mentioned, the Seller shall pay to Edw. R. Carr, Inc., its agent hereunder, Twenty-Five Thousand Dollars ($25,000.00) of said deposit for its services hereunder."
> 3. The $55,000 commission was to be paid "at the

time of settlement of this contract * * * from the
sale proceeds * * *."

The parties agreed by these provisions that the broker's com-
mission was to be paid at the time of settlement from that por-
tion of the sales price—$700,000—that was to be paid at the
stipulated time and place of settlement. In some cases a pro-
vision that a commission was to be paid at time of settlement
or when the sale was completed or at a time similarly desig-
nated, has been held not to have created a condition precedent
that there must be a settlement if there is to be a commission,
but only to have designated a time for payment, and in many
other cases the court has decided that a condition precedent has
been created. The holdings both ways are collected in an an-
notation *Broker—Right to Commission,* 74 A. L. R. 2d 437,
465, *et seq.*

In the present case we think a condition precedent was in-
tended. The Club and the broker agreed in terms that the pro-
vision as to commissions was to constitute a condition. The con-
dition was not only that the commission was to be paid at the
time of settlement but that it was to be paid from the $700,000
part of the purchase price, and the necessary inference, we find,
is that if there was no such purchase price there was to be no
commission. In *Chasanow v. Willcox, supra,* the contract pro-
vided that the broker's commission should be deducted from
the proceeds of sale and, if the purchaser defaulted, the seller
could forfeit the deposit and, if he did, the broker should re-
ceive one-half thereof. The purchaser did default and the seller
elected not to forfeit the deposit. This Court held at pages 176-
177 of 220 Md.:

"The purchaser having defaulted, there were no pro-
ceeds of sale out of which the broker could recover a
commission. The only fund, therefore, out of which the
broker could be allowed compensation for his services
to the seller under the contract, was the deposit which
the broker had retained under the terms of the con-
tract to be split fifty-fifty in case of default and for-
feiture. But, when the broker allowed the Real Estate
Commission to stampede him into returning the de-
posit to the purchaser without first having obtained the

approval or consent of the seller, there was then no fund to which the broker could look for compensation if he was entitled to any at that time under the circumstances in this case."

There are many other authorities which agree that a consummation of the sale may be intended to be a condition precedent to the right of a broker to a commission. Professor Corbin, in his work on *Contracts,* in Vol. 3A, Ch. 31 (*Express Conditions—Types and Illustrations*), Sec. 639 (*Forms of Expression That Will Make a Duty Conditional*) says: "A fact or event may be made a condition of a contract right and duty by any form of words capable of interpretation * * *. A promise can be made conditional by using language fixing the *time* of performance," citing many broker's commission cases, including *Amies v. Wesnofske* (N. Y.), 174 N. E. 436 ("balance to be paid upon the closing of title") ; *Leschziner v. Bauman* (N. J. L.), 85 A. 205 (promise to pay broker's commission is conditional when expressed to be performable "on the day of passing title") ; *Morse v. Conley* (N. J.), 85 A. 196 ("at the time of the consummation") ; *Sams v. Olympia Holding Co.* (Wash.), 279 P. 575, 577 ("when the sale is completed") ; *Tarbell v. Bomes* (R. I.), 135 A. 604 ("upon delivery of the deed and payment of the consideration") ; *Simon v. Myers* (Pa.), 130 A. 256 ("at settlement" of the total consideration). See also *Hamrick v. Cooper River Lumber Co.* (S. C.), 74 S. E. 2d 575; *Dal Maso v. Gregory* (Mun. Ct. App. D. C.), 112 A. 2d 923, *supra; Jones v. Palace Realty Co.* (N. C.), 37 S. E. 2d 906; *Beattie-Firth, Inc. v. Colebank* (W. Va.), 105 S. E. 2d 5; *E. A. Strout Realty Agency v. Gargan* (Mass.), 105 N. E. 2d 208; *Restatement, Agency 2d,* Sec. 445, comment c; 12 Am. Jur. 2d *Brokers* Secs. 195, 196, 208; 32 Col. L. Rev. 1194, *Special Conditions in Real Estate Brokerage Contracts.* See also 31 Col. L. Rev. 701-702.

In most of the authorities cited, the reason for the nonconsummation of the sale was the default of the purchaser. In the contract between the broker and the Club this reason for there being no settlement was dealt with specifically, as was the contingency of the cancellation of the contract by the purchaser because the rezoning of part of the land could not be

accomplished. In each instance the Club was to retain the $75,-000 deposit and the broker was to receive $25,000 from the Club for its services. No mention is made in the contract of what is to happen if there is no settlement because the stockholders of the Club did not approve the sale of substantially all the assets of their corporation, but we think the condition of the contract that if there was no settlement and no purchase fund from which a commission was to be paid, no commission was payable, did not exclude the contingency that the stockholders of the Club would not approve the sale.

This Court, in various decisions over a long span of years, has cited and applied "the general rule that subsisting laws enter into and form part of a contract as if expressly referred to or incorporated in its terms, and the rule embraces alike those provisions which affect its validity, construction, discharge, and enforcement." *Holmes v. Sharretts,* 228 Md. 358, 367, citing recent decisions. See also *Griffith v. Scheungrab,* 219 Md. 27, citing earlier Maryland cases to the same effect. As was pointed out in *Holmes* and in *Griffith,* Professor Corbin (3 *Corbin, Contracts,* Sec. 551) disagrees with the statement that subsisting laws are incorporated into a contract but he recognizes the validity of the general principle recognized in those cases. It is his view that "words and other symbols must be interpreted in the light of surrounding circumstances; and the existing statutes and rules of law are among those circumstances." (p. 198)

The surrounding circumstances, including the limitation by reason of Code (1957), Art. 23, Secs. 65 and 66, that the Club could not make the sale that Mr. Coates, the vice-president of the broker, had arranged without the approval of two-thirds of its stockholders, make it appear to us that the condition of no commission without a settlement and payment of the purchase price was applicable if the stockholders did not approve the sale.

Mr. Coates was a realtor of twenty-six years experience. He had been president of the Prince George's County Board of Realtors, vice-president of the Maryland Association of Real Estate Boards, and a local Maryland Real Estate Commissioner. The Club's opinion of his competence was such that he was invited to advise the stockholders in meeting assembled on how

to proceed to most advantageously sell their assets, dissolve the corporation and take their profits, and, on a second occasion, to advise another meeting of stockholders of the Club as to a tentative offer of purchase he had arranged as part of that program. We think he cannot have failed to know that the Club intended to sell substantially all of its assets, and that the stockholders were the persons who, as a group, had the final say when a chance to do so was presented, (he himself had told the second stockholders meeting he attended that one of the terms of the contract he proposed was the deposit was subject to "ratification of agreement") and that he was chargeable with knowledge that two-thirds of the stockholders must approve if such a sale were to go through. Under these circumstances, when Edw. R. Carr, Inc., by Mr. Coates, signed the contract which embodied the condition that its commission was to be paid at settlement and from the purchase price then payable, it agreed that it would get no commission unless the stockholders of the Club approved the sale as effectively as if that proviso had been written in the contract in so many words. *Holmes v. Sharretts, supra.* The judgment for the broker appealed from by the Club must be reversed.

The cross-appeal of the broker seeking to reverse the action of the trial court in sustaining demurrers to the second, third and fourth counts of the declaration, which sought recovery against the officers, Board members and certain stockholders of the Club, must fail. Count two relied on wrongful interference with the contractual obligations existing between the broker and the Club. No specifics as to what was wrongful or how the defendants interfered are given. The second count did not therefore contain a statement of facts, as distinguished from conclusions, showing on their face that the plaintiff is entitled to recover.

In count three the broker seeks to recover on the allegations that the officers and directors of the Club employed it on representations that they were authorized to do so when in reality they had no such authority. Count four is based on the same theory of law as applied to the president and vice-president of the Club alone.

*Restatement, Agency 2d,* Sec. 332, says:

"An agent making a contract for a disclosed prin-

cipal whose contracts are voidable because of lack of full capacity to contract, or for a principal who, although having capacity to contract generally, is incompetent to enter into the particular transaction, is not thereby liable to the other party. He does not become liable by reason of the failure of the principal to perform, unless he contracts or represents that the principal has capacity or unless he has reason to know of the principal's lack of capacity and of the other party's ignorance thereof."

The third and fourth counts do not specify in what way the officers and directors of the Club represented that they had authority, which they did not have, to enter into a contract of sale of substantially all of the assets of the Club, knowing the broker relied thereon. If it be assumed, as seems most likely, that the individual defendants did not reveal to the broker the limiting provisions of Code (1957), Art. 23, Secs. 65 and 66, nevertheless, the broker was chargeable with knowledge of this limitation, equally with the officers and Board members, and the allegations of counts three and four do not state a cause of action. One dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers and this rule is applicable to those who deal with another as the officer or agent of a corporation. 13 Am. Jur. *Corporations,* Sec. 891. See also Sec. 1056.

> *Judgment of August 14, 1963, in favor of Edw. R. Carr, Inc., against Prince George's Country Club, Inc., for $55,000 with interest and costs of suit, reversed, with costs.*

> *Order of February 19, 1963, sustaining demurrers to counts of declaration seeking recovery below against the cross-appellees, affirmed, costs to be paid by the cross-appellant.*

PRESCOTT, J., dissents.