FREDERICK W. BERENS, INC. *v.* FIDELITY
MUTUAL LIFE INSURANCE COMPANY

\* \* \*

FIDELITY MUTUAL LIFE INSURANCE COM-
PANY *v.* LAUREL PLAZA, INC.

[No. 183, September Term, 1969.]

*Decided March 4, 1970.*

*Petition for rehearing filed March 25, 1970; denied April 2, 1970.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*John D. Gilmore, Jr.,* with whom was *William V. Meyers* on the brief, for appellant Frederick W. Berens, Inc.

*Jerrold V. Powers,* with whom were *Sasscer, Clagett, Powers & Channing* on the brief, for Fidelity Mutual Life Insurance Company.

*Ronald Willoner,* with whom were *DePaul & Willoner, Joseph A. DePaul* and *Robert B. Ostrom* on the brief, for appellee Laurel Plaza, Inc.

SMITH, J., delivered the opinion of the Court.

When judgment by confession was entered against appellee Laurel Plaza, Incorporated (Laurel Plaza), by appellee and appellant Fidelity Mutual Life Insurance Company (Fidelity), on a note, it proceeded on the theory that the best defense was an offense. Therefore, in addition to moving to vacate the judgment, it filed a counter-

claim in which it claimed damages of $1,500,000.00. Fidelity brought in appellant Frederick W. Berens, Inc. (Berens), as a third party defendant. The matter was submitted on issues to a jury in Prince George's County, the total time involved in trial having covered ten days, six of which were in the taking of evidence. As a result of its findings, a judgment was entered in favor of Laurel against Fidelity in the amount of $747,000.00 and in favor of Fidelity against Berens in the same amount. Berens and Fidelity each moved for judgment *n.o.v.* or, in the alternative, for a new trial. The motions were denied. We shall reverse the action of the trial court.

Laurel Plaza was the developer of a shopping center near Laurel in Prince George's County. Berens is a Washington, D. C., mortgage broker and mortgage loan correspondent. It has on occasion placed loans, with Fidelity and serviced those loans.

On December 9, 1963, Berens on behalf of Laurel Plaza submitted to Fidelity a request for a loan in the amount of $950,000.00 on the proposed shopping center of Laurel Plaza. The proposal was detailed. There were listed a number of proposed tenants. These were divided into what were labeled as "major tenants" and "local tenants". The analysis showed the proposed term of the various leases, the square foot area to be leased, the minimum rental from the various leases, estimated operating expenses, an appraisal of the land, an appraisal of the proposed buildings, etc.

On January 28, 1964, "based upon the statements as set forth in [Berens'] submission" Fidelity made a commitment to take the loan based, as always in such matters, upon a number of conditions. The commitment was good until September 29, 1964.

There were a number of extensions of the mortgage commitment. Perhaps the most significant of these were extensions to November 22, 1965, and December 30, 1965, although there was a subsequent extension to April 1, 1966. On October 22, 1965, Berens requested the extension to November 22, 1965, giving as its reason that

its general counsel had so many loans scheduled for closing that he felt it physically impossible to complete this matter by October 30, the then expiration date. Pursuant to the extension to December 30, Berens submitted a letter to Fidelity under date of December 7, 1965, in which it recognized deviation from the data submitted prior to the original commitment. Equitable Trust Company appeared on the original proposal with an indication that its lease would be for 10 years for 5000 square feet with a minimum rental of $20,000 per year. All leases were to be assigned to Fidelity as additional collateral. In this letter Berens said:

> "Shortly after the commencement of construction, Equitable Trust Company requested that [Laurel Plaza] lease a 30,000 sq. ft. site at the Southwest corner of the property to them so that they could construct their own free-standing building. On August 23, 1965, Equitable entered into a fifteen-year lease with the owner for this site at an annual net rental of $10,800. Construction on the new facility has begun."

The land upon which the Equitable building was erected was outside the area originally proposed to be included in the deed of trust securing the loan of Fidelity. The December 7 letter proposed that the new Equitable building area be added to the deed of trust *subordinate* to a prior lien on it held by Equitable. There was no proposal for assignment of the lease as additional collateral as other leases were assigned. The letter also said:

> "During the course of concluding the leasing arrangements, the two store areas reserved for occupancy by shoe companies were leased to other retail tenants due to conflicts between the companies and their subsequent failure to execute the proposed leases. The overall character of the national tenants in occupancy has altered due to the loss of the shoe companies and the

relocation of the bank property to an adjacent site. * * *

   * * *

"We believe that the present security for the mortgage is an improvement over the original proposal due to the increased land and building areas, the improvement of the total income produced by the Center, the related increase in the overall valuation of the project, and the additional security of the mortgage position covering the bank site. Each of the foregoing factors have been realized without any additional dollar investment on the part of Fidelity Mutual."

As a matter of fact, a summary of the tenancy is as follows:

| Tenant | As originally submitted | | | | Actual | | |
|---|---|---|---|---|---|---|---|
| | Term | Sq. ft. | Per Year | | Term | Per ft. | Sq. Year |
| Drug Fair | 20 years | 15,000 | $27,000 | | 20 years | 18,340 | $26,250 |
| Grand Union | 18 years | 20,800 | $35,000 | | 18 years | 20,059 | $35,000 |
| Household Finance | 10 years | 1,200 | $ 4,200 | | 3 years | 1,766 | $ 7,000 |
| Endicott Johnson | 20 years | 4,200 | $11,550 | | — | | |
| Aristo Cleaners | 15 years | 4,000 | $12,000 | | 5 years | 1,415 | $ 4,200 |
| Equitable Bank | 10 years | 5,000 | $20,000 | | — | | |
| Shoe Mart | 10 years | 2,880 | $ 8,352 | | — | | |
| High's Dairy | 10 years | 1,750 | $ 5,250 | | 10 years | 1,797 | $ 5,250 |
| Goodwill Industries | — | | | | 5 years | 6,075 | $21,263 |
| | | 54,830 | $123,352 | | | 49,452 | $98,963 |
| Minor Leased area | | 3,738 | $ 14,786 | | | 10,870 | $39,750 |
| | | 58,568 | $138,138 | | | 60,322 | $138,713 |
| Vacant | | 7,156 | $ 14,112 | | | 11,174 | $ 22,348 |

On the basis of these facts Fidelity advised Berens that it could only loan $550,000. Goodwill was not regarded by Fidelity as a satisfactory "major" tenant.

Two of the conditions of the commitment were:

"3. A refundable 2% standby fee ($19,000.) is to be deposited with this office, within two weeks, to be retained until loan is closed according to the terms of this commitment. If on the expiration date of this commitment, loan

has not been closed and the expiration date not extended as explained elsewhere in this letter, then The Fidelity Mutual Life Insurance Company will retain this entire fee.

\* \* \*

"12. All leases covering the proposed shopping center are to be forwarded to this office for review by the Law Department prior to start of construction. All leases are to be assigned as additional collateral for this loan. The list of tenants and the terms are to be as mentioned in the original mortgage submission."

At the end of the conditions it is stated:

"This mortgage commitment, subject to the above conditions, will extend for a period of nine months, or until September 29th, 1964, unless the date under Paragraph #13 above, is in advance of this date—whichever is sooner, unless these conditions are amended by this Company in writing. Any request for an amendment must be received by this office in writing at least thirty (30) days prior to the expiration date or commencement of the lease, whichever is sooner."

The confessed judgment note for $9,500.00 upon which judgment was entered against Laurel Plaza in favor of Fidelity was a part of the $19,000.00 standby fee.

The counterclaim brought by Laurel Plaza against Fidelity alleged the mortgage commitment, the construction of the shopping center as a result of this commitment, the breach on the part of Fidelity of the commitment and the resulting loss to Laurel by way of foreclosure, with damages claimed in the amount of $1,500,000.00. The third-party claim of Fidelity against Berens stated that there had been no breach by Fidelity of its agreement "and that any waiver or modification of the terms or conditions of the said agreement which would purportedly obligate Fidelity to perform were either not made at all,

or were made by Frederick W. Berens, Inc., Third Party, without the authority or apparent authority of Fidelity" and prayed judgment against Berens for the amount of any judgment which might be rendered against Fidelity.

By stipulation, in the trial of the case Laurel Plaza was regarded as plaintiff and Berens and Fidelity as defendants.

Berens and Fidelity both appear in this Court as appellants from the entry of judgment against them as a result of the jury's verdict. Fidelity appears as appellee insofar as there is judgment in its favor against Berens.

It is not necessary for us to consider the reasons raised by Berens as to why it has no liability to Fidelity because there could only be liability from Berens to Fidelity if Fidelity were liable to Laurel Plaza. We conclude, for the reasons we shall hereafter indicate, that there is no liability on the part of Fidelity to Laurel Plaza.

Since we consider this case on the basis of the motion of Fidelity for a directed verdict and its subsequent motion for judgment *n.o.v.*, the evidence and all reasonable inferences to be drawn therefrom must be considered in the light most favorable to Laurel Plaza. *P. Flanigan & Sons v. Childs,* 251 Md. 646, 653, 248 A. 2d 473 (1968).

It is obvious that the tenants and the terms of their leases do not conform with those mentioned in the original mortgage submission. Therefore, there can be no liability on the part of Fidelity to Laurel Plaza unless Fidelity has waived the conditions of the mortgage commitment either directly or through Berens or unless there is conduct on the part of Fidelity which would estop it from raising the deviation. It also is obvious that Fidelity has earned the standby fee which is the subject of the note. It, therefore, is entitled to judgment on that note unless it is determined that it is indebted to Laurel Plaza in a greater sum. It is apparent that in this case Berens acted as a mortgage broker on behalf of Laurel, and also that Berens and Fidelity intended for Berens to act ultimately in this matter as the mortgage loan correspondent of Fidelity. Accordingly, that which Chief Judge Brune

said for this Court in *Hill v. Benevicz,* 224 Md. 79, 167 A. 2d 104 (1961), is pertinent by way of explanation of the difference between the two terms and the acts performed by them:

> "Rouse's usual practice appears to be to submit applications to the F.H.A. for mortgage insurance in its own name, but to place the mortgage, when a commitment for insurance has been obtained, with one or another of the lending institutions for which it acts as mortgage correspondent, and which are themselves F.H.A. approved mortgagees. Rouse then takes the mortgage in its own name, assigns it to the lending institution and services the mortgage under a contract between Rouse and the lender, pursuant to which Rouse receives compensation. Rouse thus performs several functions in the transaction. It acts partly in its own interest, partly as agent for the lending institution and partly for the benefit of the prospective mortgagor and partly also for the benefit of the would-be seller, for without the mortgage financing the sale probably would not produce the cash consideration which he is seeking. All of these functions are well known in the business, and there is no question of an agent secretly serving his own interest or the interest of one principal to the detriment of another." *Id.* at 84.

## I.

Laurel says that in this case Fidelity expressly waived the requirements of paragraph 12 of the commitment letter. The basis of this contention on the part of Laurel is a telegram from Fidelity to Berens dated June 25, 1964, in which it was said: "Laurel Plaza leases have our approval." That telegram must be placed in its proper context, however. It was sent in reply to a telegram from Berens to Fidelity on June 25 which said, "Please confirm by wire your approval of leases submitted on Laurel

Plaza for construction lender." This was after a letter dated June 5, 1964, from Berens to Fidelity which said:

> "I am pleased to enclose for your company's review and approval, copies of the following leases covering the first section of the above shopping center, your commitment dated January 28, 1964:

| Tenant | Space | Term | Rental |
|---|---|---|---|
| Grand Union | 21,000 | 17½ | $35,000 |
| Drug Fair | 18,000 | 20 | 26,250 |
| H.F.C. | 1,750 | 3 | 7,000 |
| Highs | 1,750 | 10 | 5,250 |
| Beauty Shop | 1,750 | 10 | 5,950 |
| Aristo. | 1,400 | 5 | 4,200 |
| Barber | 1,190 | 10 | 4,800 |
| Sears Roebuck | 4,200 | 5 | 8,400 |
| TOTALS: | 51,040 | | $96,850 |

> "Under the terms of your commitment, we are to provide you with executed leases from national tenants covering 54,830 sq. ft., of which leases for 48,100 sq. ft. are enclosed. Our leasing department is presently finalizing their negotiations for the remaining required space.

> "Since all leases must be approved by your company prior to the start of construction, we are forwarding these to you in order to expedite this requirement. *We should be in a position to provide you with the remaining leases within the next three weeks.*" (emphasis added)

It is significant that Endicott Johnson and Shoe Mart, two of the major national tenants in the original proposal, were not in the list of leases submitted in the June 5 letter and never became tenants. The Sears Roebuck lease in the June 5 letter was cancelled prior to the letter from Berens to Fidelity of December 7, 1965. Berens in its letter to Fidelity of June 5 clearly indicated that additional leases would be submitted, which leases were

never submitted. Taking those facts with the letter of June 5 and the telegram from Berens to Fidelity under date of June 25 we hold that the telegram from Fidelity to Berens was indicative of approval of such leases as had been submitted up to that time. This telegram is the sole evidence of direct waiver of the provisions of paragraph 12 by Fidelity. It is legally insufficient to establish such waiver.

## II.

Laurel claims that Fidelity is bound because after Berens received the telegram of June 25 Berens wrote Laurel on June 25:

> "We have just received telegraphic confirmation of the approval of the tenant leases on the above subject property, from the Fidelity Mutual Life Insurance Company of Philadelphia, Pennsylvania.
>
> "The photostat copy attached to this letter, of their telegram will satisfy paragraph 12 of their commitment dated January 28, 1964."

It then claims that this letter becomes binding upon Fidelity on the basis of being within Berens' apparent authority as agent of Fidelity.

Berens, as a mortgage broker, had submitted applications on behalf of potential borrowers to Fidelity since sometime after World War II. In this case Berens was to service the loan for Fidelity as it had done on certain other loans. Berens was commissioned on behalf of Fidelity to accept the completed property. Berens was to "close" the loan. In the deed of trust agreement prepared relative to the construction loan, which loan it was understood upon completion of the project would be assigned to Fidelity, an employee of Berens was designated by Fidelity to inspect the various construction stages. The same paragraph of the deed of trust agreement designated other individuals to make similar inspections on behalf of the construction loan lender. The original mortgage commitment of Fidelity was altered. These changes

were effected on the stationery of Berens with a copy to Fidelity, the changes having had the prior approval of Fidelity. Laurel Plaza sees all of the above as constituting Berens the agent of Fidelity with apparent authority to approve the deviation from paragraph 12 of the commitment on behalf of Fidelity and sees the letter from Berens to Levy of June 25, 1964, as evidence of such approval. Fidelity says Berens was not its agent for this purpose.

Laurel points to the holding of our predecessors in *Heise & Bruns v. Goldman,* 125 Md. 554, 94 A. 159 (1915), in which Judge Constable said for the Court:

> "It is the undoubted rule of law of this State, and practically universal, that it is not for the Court to determine the question of agency *vel non,* but to determine whether there is any evidence tending to prove the agency, and if there is any such proof, although not full and satisfactory, it is the exclusive province of the jury to judge of its weight. 'Whether there be any evidence or not is a question for the judge; whether it is sufficient evidence is a question for the jury.' *Nat. Mech. Bank v. Nat. Bank,* 36 Md. 5; *York Co. Bank v. Stein,* 24 Md. 447; *Morrison v. Whiteside,* 17 Md. 452; *Henderson v. Mayhew,* 2 Gill, 393." *Id.* at 559.

It then says the Court was clearly correct in permitting the case to go to the jury on the question of agency.

In *P. Flanigan & Sons v. Childs, supra,* Judge Singley said for the Court:

> "The Maryland cases have not always drawn a clear line of demarcation between the doctrine of apparent authority and the theory of agency by estoppel, *Reserve Ins. Co. v. Duckett,* 240 Md. 591, 600, 214 A. 2d 754 (1965), nor have the cases in other jurisdictions, Restatement [(Second) *Agency*], Appendix § 8 at 41, 42

[(1958)]. Professor Mechem has recognized the inconsistency of a finding of apparent authority in a case where there has been no proof of an agency relationship:

'Unless the conduct therefore is such as to raise an inference of agency in fact [estoppel], or unless the act can be treated as the direct act of the principal [express authority], it is difficult to see how the act can be sustained as the act of an agent, where the person who did it was not an agent of the alleged principal.' Mechem, [*Agency*] § 721 at 510 [(2d Ed. 1914)].

"We have held that a statement made by an agent will not bind his principal until an agency is established and then only if the statement is within the scope of the agency, *Deane v. Big Spring Distilling Co.*, 138 Md. 388, 392-93, 113 A. 891 (1921), and that:

'* * * An agent cannot, however, enlarge the actual authority by his own acts without some measure of assent or acquiescence on the part of his principal, whose rights and liabilities as to third persons are not affected by any apparent authority which his agent has conferred upon himself simply by his own representations express or implied.' *Brager v. Levy*, 122 Md. 554, 561, 90 A. 102 (1914).

*Accord, McClure v. E. A. Blackshere Co.*, 231 F. Supp. 678, 685 (D. Md. 1964).

"At the same time, we have recognized that a person sought to be held as principal may create by his conduct an agency which he is estopped from denying, provided that the acts of the principal were known to and relied upon by the claimant. *Abuc Trading & Sales Corp. v. Jennings*, 151 Md. 392, 411, 135 A. 166 (1926); Restatement, *op cit.*, § 8B at 38.

"It is nearly axiomatic that one dealing with

an agent must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers. *Prince George's Club, Inc. v. Carr, Inc.,* 235 Md. 591, 609, 202 A. 2d 354 (1964) ; *Chesapeake Supply & Equip. Co. v. Manitowoc Engineering Corp.,* 232 Md. 555, 565, 194 A. 2d 624 (1963) ; *Metropolitan Club, Inc. v. Hopper, McGaw & Co.,* 153 Md. 666, 139 A. 554 (1927) ; *Brager v. Levy, supra; Lister v. Allen,* 31 Md. 543 (1869)." *Id.* at 653-54.

Restatement (Second) *Agency* § 27 (1958) states relative to the creation of apparent authority :

"Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

See also *Chesapeake, etc. v. Manitowoc,* 232 Md. 555, 565, 194 A. 2d 624 (1963) ; *Penowa Coal Sales Co. v. Gibbs & Co.,* 199 Md. 114, 119, 85 A. 2d 464 (1952) ; and *American Casualty Co. v. Ricas,* 179 Md. 627, 633, 22 A. 2d 484 (1941).

Assuming, *arguendo,* that the facts set forth by Laurel are sufficient to go to the jury on the issue of the creation of the agency, the next question which would arise would be whether Berens had apparent authority to waive the provisions of paragraph 12 of the commitment. Applying the language of the Restatement, no evidence has been presented showing "written or spoken words or any other conduct of [Fidelity] which, reasonably interpreted, [might cause Laurel] to believe that [Fidelity consented] to have the act done on [its] behalf by [Berens]."

### III.

Laurel suggests that Fidelity is estopped to deny that it approved the changes. It cites in this connection the telegram of Fidelity which has already been discussed; that Fidelity received from the attorney for the bank making the construction loan a copy of the construction loan commitment which contained in it as a condition the following language:

"Verification of the approval by Fidelity Mutual of the following leases as being sufficient and satisfactory to qualify for their [Fidelity's] commitment.";

that the only leases listed in that commitment letter were the ones to which reference has previously been made as having been transmitted to Fidelity under date of June 5; that Fidelity in conversations with the attorney for the bank making the construction loan approved the change under which the Equitable Trust Company lease was deleted; that in August of 1964 Fidelity was supplied with a site plan which listed on it "all the tenants and their locations"; that Fidelity approved the site plan; and that Fidelity knew of the cancellation of the Sears lease and of the change in the Household Finance Corporation lease. Laurel Plaza says:

"All of these changes except the Equitable lease, occurred prior to Laurel borrowing the construction loan or constructing the center. Had Laurel been informed by Fidelity that it would not make the permanent loan based on those leases, Laurel would not have borrowed the money or built the shopping center. Furthermore, Laurel would not have cancelled the lease with Equitable had it known its loan commitment was in jeopardy because of that cancellation. The evidence clearly shows that Fidelity knew that Equitable would not lease prior to the time when Laurel released Equitable from their lease."

All of the above contentions of Laurel Plaza do not appear as clearly as Laurel Plaza would have us believe they appear. If all of the above were true, however, there still would remain the fact there is no clear-cut showing that Fidelity at any time knew prior to the submission on December 7, 1965, that Laurel did not have Endicott Johnson and Shoe Mart, two of the major national tenants listed in the original proposal, as tenants. Although no provision was made in the commitment for suitable substitutes, there were none. Accordingly, the contentions relative to equitable estoppel must fall.

## IV.

Laurel claims that the motion for a directed verdict on behalf of Fidelity was not sufficiently broad to embrace an objection to the sufficiency of the evidence to establish approval by Fidelity or that Fidelity was estopped to deny that it had approved the changes. It further contends that Fidelity has failed to raise the question of the sufficiency of the evidence on these last two points on appeal. The short answer to the first contention is that a careful reading of the grounds stated by counsel for Fidelity convinces us that this point was covered. On appeal Fidelity argued, "The undisputed evidence showed that Laurel Plaza did not comply with the terms of Fidelity's loan commitment." It appears, therefore, that Fidelity is standing on its argument that there had to be compliance with the original terms of the commitment. Inherent in this argument is the position that there was never any approval which would excuse Laurel from performing according to the commitment. These contentions of Laurel Plaza, therefore, are without merit.

*Judgments reversed, Laurel Plaza, Incorporated, to pay the costs, and case remanded for entry of a judgment in accordance with this opinion.*