554 A.2d 366

**STATE of Maryland et al.**

v.

**BURNING TREE CLUB, INC. et al.**

**No. 106, Sept. Term, 1987.**

Court of Appeals of Maryland.

March 8, 1989.

Robert A. Zarnoch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Kaye Brooks Bushel, Asst. Atty. Gen., on the brief), Annapolis, for appellant.

Benjamin R. Civiletti (James A. Dunbar and Venable, Baetjer and Howard, on brief), for appellee.

Anti–Defamation League of B'Nai B'Rith—Daniel Goldstein and Brown & Goldstein, Baltimore, Livia D. Thompson, Jill L. Kahn, Justin J. Finger, Jeffrey P. Sinensky, Meyer Eisenberg, Harold Heller, New York City, for amicus curiae.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ELDRIDGE, Judge.

In 1965, the Maryland General Assembly enacted Chapter 399 of the Acts of 1965, then codified as Maryland Code (1957, 1965 Cum.Supp.), Art. 81, § 19(e), and presently codified as Code (1986, 1988 Cum.Supp.), § 8–213 of the Tax–Property Article, which authorized the State to enter into agreements with private country clubs under which the

clubs would maintain their land as open spaces in exchange for favorable assessment of those lands for property tax purposes.[1] As originally enacted, this legislation was silent with respect to any type of discrimination. In 1965, pursuant to this enactment, Burning Tree Country Club, a golf club in Montgomery County, Maryland, entered into a 10-year agreement with the State to maintain its land as open spaces in exchange for a favorable tax assessment.

In 1974, the General Assembly, by Ch. 870 of the Acts of 1974, amended Art. 81, § 19(e), to provide that country clubs which discriminated "in granting membership or guest privileges based upon the race, color, creed, sex or national origin of any person or persons" could not qualify for the preferential tax assessment. Ch. 870 provided two exceptions to the prohibition against sex discrimination: the "primary purpose" provision and the "periodic discrimination" provision. Ch. 870 stated in relevant part:

"The provisions of this section with respect to discrimination in sex shall not apply to any club whose facilities are operated with the primary purpose, as determined by the Attorney General, to serve or benefit members of a particular sex, nor to clubs which exclude certain sexes on certain days and at certain times."

In 1975, Burning Tree, which restricts its membership to men and permits only members and their male guests to use its facilities, extended its open spaces agreement with the State for another ten years. In 1978, the Attorney General of Maryland, pursuant to his authority under § 19(e)(4), determined that the sex discrimination ban in Ch. 870 was inapplicable to Burning Tree because it was operated with the primary purpose of serving one sex. In 1981, Burning Tree entered into a 50-year "open spaces" agreement with the State. From 1974 to the present, Burning Tree has

---

1. Under these agreements the property was assessed as undeveloped land, rather than at its "best use," as if it were "developed to the same density as the surrounding area." *Burning Tree Club v. Bainum*, 305 Md. 53, 57, 501 A.2d 817, 819 (1985).

been the only country club to benefit from the primary purpose provision.

In 1983, Stewart Bainum[2] and Barbara Renschler brought suit, as taxpayers and, in Ms. Renschler's case, as a woman seeking membership in Burning Tree, to have the primary purpose provision declared unconstitutional on the ground that it violated Art. 46 of the Maryland Declaration of Rights, known as the Equal Rights Amendment or E.R.A. That case reached this Court and was decided in *Burning Tree Club v. Bainum*, 305 Md. 53, 501 A.2d 817 (1985). A majority of the Court held that the primary purpose provision violated the E.R.A., *Burning Tree Club v. Bainum, supra*, 305 Md. at 85–88, 501 A.2d 817 (opinion of Judge Rodowsky), 88–102, 501 A.2d 817 (opinion of Judge Eldridge joined by Judge Cole and Judge Bloom), 501 A.2d at 833–842. A somewhat different majority of the Court, however, held that the primary purpose provision was not severable from the language of Ch. 870 prohibiting sex discrimination, *Burning Tree Club*, 305 Md. at 80–84, 501 A.2d at 830–833 (opinion of Chief Judge Murphy, joined by Judge Smith and Judge Orth), 305 Md. at 88, 501 A.2d at 835 (opinion of Judge Rodowsky). The Court's conclusion, therefore, was that

"[t]he invalid primary purpose provision is not severable from the prohibition against sex discrimination so that the latter falls, together with the then completely superfluous periodic discrimination provision." 305 Md. at 83–84, 501 A.2d at 832.

The result of that decision was to permit Burning Tree to continue receiving its tax benefit while also maintaining its discriminatory policies. Within six weeks of this Court's decision in *Burning Tree Club v. Bainum*, a bill was introduced in the General Assembly to reinstate the prohibition against sex discrimination by country clubs receiving the tax assessment benefit. The bill, as amended during

---

2. Stewart Bainum was, at the time, a member of the Maryland State Senate, representing a portion of Montgomery County.

the legislative process, was ultimately enacted as Ch. 334 of the Acts of 1986. Ch. 334 as codified states in its entirety:

"(a) *In General*—Except as provided in subsection (b) of this section, if a country club that meets the qualifications of § 8–212 of this subtitle allows or practices discrimination based on race, color, creed, sex or national origin in granting membership or guest privileges, the country club may not make an agreement under this subtitle.

"(b) *Exception*—If the country club excludes certain sexes on specific days or at specific times on the basis of sex, the country club does not discriminate under subsection (a) of this section."

Subsection (b) of Ch. 334 is, in essence, the periodic discrimination provision which had not been specifically challenged in the prior litigation but which this Court struck down as "completely superfluous."

On June 23, 1986, the Supervisor of Assessments for Montgomery County, acting pursuant to the new statute, notified Burning Tree that effective July 1, 1986, the country club's lands would be assessed at their full cash value because of the club's discriminatory membership policies. On June 30, 1986, Burning Tree and two of its members filed the present action in the Circuit Court for Anne Arundel County against the State of Maryland, the Governor, the Attorney General, and the State Department of Assessments and Taxation, seeking declaratory and injunctive relief.[3] In its complaint, Burning Tree asserted (1) that Chapter 334 was intended to have only prospective effect and did not affect Burning Tree's current 50-year "open spaces" contract with the state; (2) that if Chapter 334 was held to affect Burning Tree's current contract, it violated Art. 1, § 10 (the Contract Clause) of the United States Constitution; (3) that Chapter 334 was a special law prohib-

---

3. The plaintiffs collectively will hereafter be referred to as "Burning Tree," and the defendants collectively will be referred to as "the State."

ited by Article III, § 33, of the Maryland Constitution; (4) that Chapter 334 violated Burning Tree's members' freedom of association rights under the United States Constitution; and (5) that the periodic discrimination exception in Chapter 334 violated the E.R.A. and that the unconstitutional language was not severable from the overall prohibition of sex discrimination in Chapter 334.

On July 21, 1987, the Circuit Court for Anne Arundel County granted the State's motion for summary judgment with respect to the first four contentions but granted summary judgment in favor of Burning Tree as to the contention that the periodic discrimination provision violated the E.R.A. In addition, the circuit court agreed with Burning Tree that the periodic discrimination provision was not severable from the overall prohibition on sex discrimination in Ch. 334. The circuit court's conclusions were embodied in a declaratory judgment. While an injunction had been prayed for, the circuit court, for some unexplained reason, did not issue one, even though Burning Tree had not paid all its taxes due and had prevailed with respect to its E.R.A. contention.[4]

The State and Burning Tree filed cross-appeals to the Court of Special Appeals, and, before any proceedings in the Court of Special Appeals, both sides filed in this Court petitions for a writ of certiorari. Thereafter, this Court granted both petitions. In this Court, Burning Tree advances the same five contentions made in the circuit court and set forth above.

---

**4.** At oral argument before this Court, counsel for Burning Tree indicated that the club had still not paid the full taxes demanded by the State and was accruing penalties as a result. Consequently, this case does not involve the situation addressed in cases such as *Apostol v. Anne Arundel County,* 288 Md. 667, 672, 421 A.2d 582 (1980), in which we stated: "It is firmly established in this State that once a taxpayer voluntarily pays a tax or other governmental charge, under a mistake of law or under what he regards as an illegal imposition, ... no common law or declaratory judgment action lies to challenge the validity of a tax so paid." *See also Nordheimer v. Montgomery County,* 307 Md. 85, 96–98, 512 A.2d 379, 385–386 (1986), and cases cited therein.

We shall, in agreement with the circuit court, reject the first four of Burning Tree's arguments. As to the fifth argument, we agree with the circuit court and with Burning Tree that the periodic discrimination provision violates the E.R.A. Nevertheless, we shall hold that the invalid periodic discrimination provision is severable from the broad prohibition against sex discrimination contained in Ch. 334.

## I.

■ The first issue before us is whether Ch. 334 of the Acts of 1986 addresses only future contracts and is therefore inapplicable to the 50-year contract entered into by the State and Burning Tree in 1981. Burning Tree argues that the plain language of Ch. 334, particularly the words "may not make an agreement under this subtitle," addresses only future contracts and does not affect clubs with existing agreements.

The court below, after examining the legislative purpose and history of Ch. 334, concluded that the statute was intended to apply to contracts in force at the time it was enacted. The court noted that the statute would not apply retroactively to the tax benefits Burning Tree had already received under the contract prior to Ch. 334's enactment. We agree with the circuit court's conclusion.

The background and legislative history of the phrase in Ch. 334, "may not make an agreement under this subtitle," refutes Burning Tree's argument that the language applies only to future agreements. Art. 81, § 19(e), as reenacted in 1974, stated in relevant part as follows (emphasis added):

"4. *In order to qualify under this section*, the club shall not practice or allow to be practiced any form of discrimination in granting membership or guest privileges based upon the race, color, creed, sex, or national origin of any person or persons.... The provisions of this section with respect to discrimination in sex do not apply to any club whose facilities are operated with the primary purpose, as determined by the Attorney General, to serve or benefit members of a particular sex, nor to the clubs which

exclude certain sexes only on certain days and at certain times. If the Attorney General determines that a pattern of discrimination is evident in any club, he shall negotiate a consent agreement with that club to cease such discrimination. If that club breaches or violates the consent agreement or refuses to enter a consent agreement, then the Attorney General shall issue a cease and desist order to that club. If the club breaches or violates the terms of the cease and desist order, the tax exemption, tax credit or beneficial assessment shall be withdrawn,.... Further, any club which fails to qualify as a country club under paragraph (4) because the club has engaged in discrimination is not liable for unpaid taxes provided for in paragraph (7)....

"(7) *If, prior to the expiration of the agreement,* or any extension thereof, ... *said property* ceases to be used as, or *fails to qualify as, a country club,* whichever is the earlier date, the unpaid taxes ... become due and payable."

This was the statutory language in effect when the current contract was entered into.

In 1985, as part of the on-going recodification process which began in 1973, Art. 81 was revised and the relevant passages were placed in §§ 8–214 and 8–215(d) of the Tax–Property Article of the Code. Those sections provide as follows (emphasis added):

"§ 8–214. Same—Discrimination.

"(a) *In General.*—Except as provided in subsection (b) of this section, if a country club that meets the qualifications of § 8–212 of this subtitle allows or practices discrimination based on race, color, creed, sex, or national origin in granting membership or guest privileges, the country club *may not make an agreement* under this subtitle.

"(b) *Exceptions.*—If the facilities of a country club that meets the qualifications of § 8–212 of this subtitle are operated with the primary purpose of serving or benefiting members of a particular sex or if the country

club excludes certain sexes on specific days or at specific times on the basis of sex, the country club does not discriminate under subsection (a) of this section."

**"§ 8–215. Same—Determination of discrimination and consent agreements.**

\* \* \* \* \* \*

"(d) *Assessing on failure to comply.*—(1) If a country club fails to comply with an order issued under subsection (c) of this section, the country club may not be assessed as a country club under § 8–213 of this subtitle until the Attorney General determines that the country club complies with the order.

(2) A country club that has failed to comply with an order issued under subsection (c) of this section shall be assessed as if there were no agreement under § 8–213 of this subtitle. However the country club is not liable for the unpaid taxes described in § 8–216 of this subtitle."

\* \* \* \* \* \*

According to the Revisor of Statutes, the language of §§ 8–214(a) and 8–215(d) was "new language derived without substantive change" from former Art. 81, § 19(e). Revisor's Note to §§ 8–214 and 8–215. The Revisor's Note to § 8–214 adds:

"Also in subsection (a) of this section, the phrase 'may not make an agreement under this subtitle' is substituted for the former phrase 'in order to qualify under this section' for clarity."

This Court has consistently taken the view that " 'the revisor's note is a useful guide to the legislative purpose underlying [a] change in statutory language.' " *Nationwide v. USF & G,* 314 Md. 131, 147, 550 A.2d 69, 77 (1988), quoting *Rohrbaugh v. Estate of Stern,* 305 Md. 443, 450, 505 A.2d 113 (1986). That the revised language at issue here created no substantive change is further underscored by the principle that " 'a language change effected during the course of formal code revision accomplishes no substantive change absent the clearest legislative intent.' " *Na-*

*tionwide v. USF & G, supra,* 314 Md. at 147, 550 A.2d at 77, quoting *McGarvey v. State,* 311 Md. 233, 242, 533 A.2d 690 (1987).

The only effect of the decision by this Court in *Burning Tree v. Bainum, supra,* was to eliminate the word "sex" from § 8–214(a) and to eliminate the exceptions in § 8–214(b) to the prohibition against sex discrimination. Ch. 334 of the Acts of 1986 re-enacted § 8–214, making only two changes. It deleted the invalid "primary purpose" provision from § 8–214(b) and it restored the word "sex" to § 8–214(a):

> "(a) *In General* —Except as provided in subsection (b) of this section, if a country club that meets the qualifications of § 8–212 of this subtitle allows or practices discrimination based on race, color, creed, sex or national origin in granting membership or guest privileges, the country club may not make an agreement under this subtitle.

> (b) *Exception*—If the country club excludes certain sexes on specific days or at specific times on the basis of sex, the country club does not discriminate under subsection (a) of this section."

What this background makes clear is that the language at issue here—"may not make an agreement"—is not new language in Ch. 334. It first appeared in the 1985 revision of Art. 81 and was intended to have the same meaning as the words "in order to qualify under this section" in Art. 81, § 19(e)(4)(i).

It is apparent that, under Art. 81, § 19(e), "qualifying" is an ongoing process, not merely an initial step, and that a club may "fail to qualify" at any time during the course of the agreement and have its "tax benefit or preferential assessment ... withdrawn." This is underscored by the administrative construction of Art. 81, § 19(e). In response to the 1974 enactment, the Attorney General's Office investigated the discriminatory practices of all country clubs, regardless of whether their assessment agreements predat-

ed July 1, 1974, the date of the legislative enactment. Thus the Attorney General's understanding of Art. 81, § 19(e), and his practice in enforcing it, was that it applied to clubs with existing agreements. The administrative construction of a statute is, of course, entitled to weight. *See, e.g., Sinai Hosp. v. Dep't of Employment,* 309 Md. 28, 46, 522 A.2d 382 (1987); *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307 (1986), and cases there cited.

Moreover, the words "may not make," as codified in § 8–214, are linked to the enforcement machinery described in § 8–215. Clearly the language of § 8–215, which speaks of assessing country clubs "as if there were no agreement under § 8–213 of this subtitle," contemplates enforcement against clubs with existing contracts.

Finally, Burning Tree's construction would entirely defeat the purpose of Ch. 334. Ch. 334 was enacted within six months of, and in response to, this Court's decision in *Burning Tree Club v. Bainum, supra.* The sponsor of the bill was Senator Bainum, whose lawsuit had attempted to deprive Burning Tree of its tax assessment benefit. The Legislature's obvious intent was to reenact the prohibition against sex discrimination and make it applicable to existing contracts. If we were to hold Ch. 334 inapplicable to existing contracts, no country club under a current "open spaces" contract would be required to alter discriminatory policies until its contract expired. In the case of Burning Tree, the club would continue to receive its tax benefit until the year 2031. It is implausible that the General Assembly would move with such alacrity to enact a ban on sex discrimination which would have no effect for such a long period.

In *State Commission on Human Relations v. Amecom Div.,* 278 Md. 120, 360 A.2d 1 (1976), this Court held that an antidiscrimination statute applied to existing contracts, rejecting an argument that the statute was not applicable to employees under employment contracts entered into before the statute passed. The Court said, "the purpose of [the

statute]·may only be adequately served by retroactive appli-
cation with regard to the date of formation of the con-
tract.... [G]iving [the statute] effect only with regard to
contracts of employment entered into after [the date of the
statute] would mean that an employee of long standing
would find the [statutory] remedy unavailable while a new
employee could receive its benefits. Such an absurd result
could not have been intended...." 278 Md. at 127, 360
A.2d at 6.

Similarly, in the present case, the legislative purpose of
eliminating state support for discrimination would only be
adequately served by making Ch. 334 applicable to current
as well as future contracts.

## II.

■ Burning Tree next argues that applying Ch. 334 to
Burning Tree's present contract with the State impairs the
obligation of the contract in violation of the Contract Clause
of the United States Constitution, Art. I, § 10, which pro-
vides that "no State shall ... pass any ... Law impairing
the Obligation of Contracts." Burning Tree contends that
Ch. 334's prohibition against sex discrimination imposes a
unilateral change in the contractual obligation between the
State and Burning Tree. According to Burning Tree, when
the 50–year contract was entered in 1981, the primary
purpose exception was part of the law and the contract.
The removal of the primary purpose exception by Ch. 334,
the argument continues, imposes a much heavier obligation
upon the club than it agreed to undertake when it signed
the contract, thereby violating the Contract Clause. In our
view, however, Ch. 334 does not impair the obligation of
contract in violation of the Contract Clause.

It is a fundamental principle that contracts are subject to
the public policies and valid laws existing at the time and
place in which they are made. Thus the Supreme Court
stated in *Abilene National Bank of Abilene v. Dolley*, 228
U.S. 1, 5, 33 S.Ct. 409, 410, 57 L.Ed. 707, 709 (1913):
"Contracts made after the law was in force, of course, are

made subject to it, and impose only such obligations and create only such property as the law permits." Consequently, courts in a wide variety of contexts have refused to enforce contractual provisions which conflicted with laws or public policy.[5] *See, e.g., Otis & Co. v. Securities and Exchange Comm.,* 323 U.S. 624, 638, 65 S.Ct. 483, 490, 89 L.Ed. 511, 522 (1945); *United States v. City and County of San Francisco,* 310 U.S. 16, 28, 60 S.Ct. 749, 756, 84 L.Ed. 1050, 1059 (1940); *Gable v. Colonial Ins. Co.,* 313 Md. 701, 704, 548 A.2d 135, 136 (1988); *Lee v. Wheeler,* 310 Md. 233, 243, 528 A.2d 912, 917 (1987); *Jennings v. Government Employees Ins.,* 302 Md. 352, 488 A.2d 166 (1985); *Budget Rent-A-Car v. Raab,* 268 Md. 478, 482–483, 302 A.2d 11, 13–14 (1973); *Baxter v. Wilburn,* 172 Md. 160, 162–164, 190 A. 773, 775 (1937).

The Maryland Equal Rights Amendment, enacted in 1972, mandated equality of rights under the law and rendered state-sanctioned sex-based classifications suspect. Decisions by this Court prior to 1981 made it clear that sex-based classifications were generally forbidden by the E.R. A. *See, e.g., Rand v. Rand,* 280 Md. 508, 515–516, 374 A.2d 900 (1977); *Md. St. Bd. of Barber Ex. v. Kuhn,* 270 Md. 496, 506–507, 312 A.2d 216 (1973). The E.R.A. and the judicial decisions construing it represent the law and public policy of the State. Every Maryland contract entered with the State government since the enactment of the E.R.A. has

---

5. In addition to invalidating contractual provisions that conflict with laws, a corollary principle reads existing laws into the terms of contracts. Thus, as we stated in *Prince George's Club v. Carr,* 235 Md. 591, 607, 202 A.2d 354 (1964):

"This Court, in various decisions over a long span of years, has cited and applied 'the general rule that subsisting laws enter into and form part of a contract as if expressly referred to or incorporated in its terms'" *(quoting Holmes v. Sharretts,* 228 Md. 358, 367, 180 A.2d 302 (1962)).

*See also Wright v. Commercial Sav. Bank,* 297 Md. 148, 153, 464 A.2d 1080 (1983); *Design & Funding v. Betz Garage,* 292 Md. 265, 276, 438 A.2d 1316 (1981); *Dennis v. City of Rockville,* 286 Md. 184, 189–190, 406 A.2d 284 (1979).

been subject to the constitutional provision and the judicial decisions under it.

In addition, Ch. 870, enacted in 1974, among other things, denied tax benefits to country clubs that discriminated on the basis of sex. This provision was constitutional, and the 1981 contract was made subject to it as well. The fact that this particular language later became ineffective on severability grounds does not alter its status as a valid public policy to which the contract was subject.

Ch. 870 also created a sex-based classification, permitting clubs operated with the primary purpose of serving one sex to continue receiving tax benefits. This provision violated the E.R.A. and was invalid from its inception. *Burning Tree v. Bainum, supra,* 305 Md. at 84, 501 A.2d at 832.

Contracting parties are presumed to be "mindful of the existing law." *Wright v. Commercial Sav. Bank,* 297 Md. 148, 153, 464 A.2d 1080, 1083 (1983). Yet, despite the E.R.A. and this Court's decisions that sex-based classifications under state law were constitutionally suspect, Burning Tree purportedly relied on the invalid primary purpose provision when entering into the 1981 contract. Burning Tree now claims that Ch. 334 imposes new and onerous obligations of which it was unaware when it contracted in 1981. But Ch. 334 imposes no obligation on Burning Tree that was not imposed by valid laws and public policy in effect in 1981. It simply restores the language banning sex discrimination which was part of the law to which the contract was subject in 1981. The Contract Clause does not bind the State to carry out the terms of a statute which was unconstitutional. Such a result would violate the principle that courts will not enforce invalid terms; it would give greater weight to a contracting party's unwarranted reliance on an invalid statute than to the actual laws and public policies of the State.

Apart from our rejection of Burning Tree's Contract Clause argument on the ground that it ignores the law and public policy existing at the time the contract was made, we

do not believe that Burning Tree's argument prevails under traditional Contract Clause analysis.

The Supreme Court, in *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569, 580 (1985), articulated the approach to be used in considering contract clause arguments:

"The threshold inquiry is 'whether the state law has, in fact operated as a substantial impairment of a contractual relationship.' *Allied Structural Steel v. Spannous*, 438 U.S. 234, 244 [98 S.Ct. 2716, 2722, 57 L.Ed.2d 727] (1978).... If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, *United States Trust Co. [v. New Jersey]*, 431 U.S. [1], at 22 [97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977) ], such as the remedying of a broad and general social or economic problem.

\* \* \* \* \* \*

"Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilites of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' *United States Trust Co.*, 431 U.S. at 22 [97 S.Ct. at 1517]."

*See Chevy Chase S & L v. State*, 306 Md. 384, 416, 509 A.2d 670 (1986); *Robert T. Foley v. W.S.S.C.*, 283 Md. 140, 389 A.2d 350 (1978).

We shall assume, arguendo, that Ch. 334 does operate as a substantial impairment of the contractual relationship between Burning Tree and the State. But, as the above quotation makes clear, a finding of substantial impairment is merely a threshold step; it does not necessarily lead to the conclusion that the Contract Clause has been violated.

If the State has "a significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem," and if the

means employed by the State are "appropriate to the public purpose," then even a substantial impairment will not violate the Contract Clause. *Energy Reserves Group v. Kansas Power & Light, supra,* 459 U.S. at 411–412, 103 S.Ct. at 704–705, 74 L.Ed.2d at 581. The public purpose behind Ch. 334 was the elimination of state-sanctioned sex discrimination. The significance and legitimacy of this purpose is beyond doubt.

Furthermore, the means employed in Ch. 334 are reasonable and necessary to carry out the purpose of the statute. The Supreme Court has cautioned that, "[w]hen the State is a party to the contract, 'complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.' " *Energy Reserves, supra,* 459 U.S. at 412–413 n. 14, 103 S.Ct. at 705 n. 14, quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 26, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977). Nevertheless, the means employed in this case are not arbitrary or oppressive. Ch. 334 does not even prohibit Burning Tree from discriminating. It simply provides that, if Burning Tree continues to discriminate, its property will be assessed in the same manner as the property of other taxpayers in the area. On the other hand, Ch. 334 gives Burning Tree the choice of retaining its preferential tax assessment by discontinuing its discriminatory policies. Finally, Ch. 334 in no way requires Burning Tree to reimburse the State for any of the tax advantages it enjoyed in years previous to the enactment. The elimination of sex-discrimination was not a subterfuge for the State to extricate itself from a financial obligation. In our view, the statute imposes no greater impairment than was necessary to remove the imprimatur of the State from sex discrimination.

### III.

■ Burning Tree contends that Ch. 334 is a "special law" passed in violation of Art. III, § 33, of the Maryland Constitution. Art. III, § 33, provides that the General Assembly "shall pass no Special Law, for any case, for

which provision has been made, by an existing General Law...." This Court has identified a "special law" as "one that relates to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class." *Prince George's Co. v. B. & O.R. Co.*, 113 Md. 179, 183, 77 A. 433 (1910).

Burning Tree's special law argument is that Ch. 870, enacted in 1974, created a class of clubs that were permitted to discriminate on the basis of sex while enjoying the "open spaces" tax benefit. That class was composed of Burning Tree, which wholly discriminates on the basis of sex, and those clubs that engage in periodic discrimination. Burning Tree argues that, among all the members of that class, Ch. 334 imposes a burden only on Burning Tree, as the others remain exempt because of the periodic discrimination provision.

The short answer to Burning Tree's argument is that, because in Part V of this opinion we invalidate the periodic discrimination provision, Burning Tree is not the only club in its self-described class that will be forced to change its policies or lose its tax benefit. Even if we were not to invalidate the periodic discrimination provision, however, Ch. 334 as enacted would not be a "special law."

In *Cities Service Co. v. Governor*, 290 Md. 553, 567, 431 A.2d 663 (1981), this Court examined decisions applying § 33, concluding that "no mechanical rules for deciding cases" exist. Nonetheless, the Court enumerated several factors to be considered in deciding whether a statute is a "special law." The Court reiterated the importance of these factors in *State v. Good Samaritan Hospital*, 299 Md. 310, 473 A.2d 892 (1984). The factors include: whether "the underlying purpose of the legislation is to benefit or burden a particular class member or members"; whether particular people or entities are identified in the statute; and what "the substance and 'practical effect'" of a statute is and not simply its form. *State v. Good Samaritan Hospital, supra,* 299 Md. at 330, 473 A.2d at 902; *Cities Service Co. v. Governor, supra,* 290 Md. at 569, 431 A.2d at

672–673. Our past decisions have also considered whether particular entities or individuals sought and obtained special advantages under the legislation or if other similar entities or individuals were discriminated against by the legislation. *Cities Service Co., supra,* 290 Md. at 570, 431 A.2d at 673. In deciding whether a law violates § 33 in applying to only certain members of a class, we have looked to whether the statute's distinctions are arbitrary or unreasonable. *Ibid.* Moreover, this Court has held that some enactments were not special laws even though they applied to only a single entity. Such laws are permissible where unique circumstances render the entity a class unto itself, *Cities Services Co., supra,* 290 Md. at 568, 431 A.2d at 672, or where the enactment, although it affects only one entity currently, would apply to other similar entities in the future, *Reyes v. Prince George's County,* 281 Md. 279, 305–306, 380 A.2d 12 (1977); *Potomac Sand & Gravel v. Governor,* 266 Md. 358, 379, 293 A.2d 241 (1972).

In light of these considerations, we turn to the merits of Burning Tree's assertion that it is the only member of its class which is singled out by Ch. 334. The underlying purpose of Ch. 334 was to eliminate state conferred benefits for clubs that discriminate on the basis of sex. The legislation was not aimed at benefiting or burdening Burning Tree or any other particular club. Neither Burning Tree nor any other club is singled out by name in the statute. Nor is Burning Tree the only club to which Ch. 334's prohibition on sex discrimination applies.

■ Contrary to Burning Tree's contention that it is the only entity affected by Ch. 334, the prohibition of sex discrimination in that enactment applies to all current and future country clubs with open spaces contracts, including the other members of Burning Tree's self-described class. While Ch. 334 purports to permit clubs to engage in sex discrimination on certain days or certain times, the prohibition against sex discrimination is otherwise applicable to all members of the class in such matters as membership, facilities, dues, etc. Thus, Ch. 334's prohibition against sex

discrimination does not apply solely to Burning Tree. Nor does the periodic discrimination exception in Ch. 334 exclude Burning Tree or any other club. If it were valid, it would be available to any entity, including Burning Tree, that otherwise qualifies and desires to take advantage of it. Simply because a law prohibits an activity that an entity engages in, and provides an exception which the entity does not want to take advantage of, does not render it a special law.

This is clearly not a case where a single entity is affected by a law. Moreover, even if this were such a case, Ch. 334 would not be a special law. As noted above, laws affecting only a single entity have been upheld where they can apply, in principle, to other similarly situated entities. In *Reyes v. Prince George's County, supra,* we held that an act empowering the county government to sell bonds in order to acquire "any sports stadium or sports arena in Prince George's County" was not a special law. Although only one arena existed in Prince George's County at the time, we held the statute was not a special law because "if the county wishes to acquire or finance other sports facilities in the county, it may do so." 281 Md. at 306, 380 A.2d at 27. Similarly, in *Potomac Sand & Gravel v. Governor, supra,* a statute which prohibited dredging in Charles County wetlands was held not to be a special law even though it currently affected only one company. The Court said: "[I]f others wished to dredge the wetlands of Charles County, they too would be prohibited from doing so." 366 Md. at 379, 293 A.2d at 252.

The decision in *Cities Services, supra,* is not inconsistent. In that case this Court held that a "mass merchandiser exception," which exempted certain retail service stations from the State's retail gasoline station divestiture law, was a special law because it benefited a single entity. However, because of the qualifying dates contained in the exemption, the single entity affected by the statute was the only entity that could ever be helped by the exemption. This is not

true in the present case as, in the future, clubs with policies similar to Burning Tree's would be similarly affected by Ch. 334.

## IV.

We now turn to Burning Tree's claim that Ch. 334 infringes upon the club members' freedom of association rights under the United States Constitution.

Recent decisions by the Supreme Court have distinguished two types of associational rights. *Board of Directors of Rotary International v. Rotary Club,* 481 U.S. 537, 544–45, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987); *Roberts v. United States Jaycees,* 468 U.S. 609, 617–618, 104 S.Ct. 3244, 3249–3250, 82 L.Ed.2d 462, 471 (1984). *See also New York State Club Ass'n v. City of New York,* —— U.S. ——, ——, 108 S.Ct. 2225, 2233–2234, 101 L.Ed.2d 1, 15–16 (1988). The first type, which has been called "freedom of expressive association," protects the right to associate "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Roberts v. United States Jaycees, supra,* 468 U.S. at 618, 104 S.Ct. at 3249, 82 L.Ed.2d at 471.

The second type of associational right, "freedom of intimate association," protects "choices to enter into and maintain certain intimate human relationships ... against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Roberts, supra,* 468 U.S. at 617–618, 104 S.Ct. at 3249, 82 L.Ed.2d at 471. *See New York State Club Ass'n, supra,* —— U.S. at ——, 108 S.Ct. at 2233–2234, 101 L.Ed.2d at 15–16; *Rotary Club, supra,* 481 U.S. at 544–45,

107 S.Ct. at 1945, 95 L.Ed.2d at 484.[6]

■ In contending that Ch. 334 infringes its members' rights to freedom of association, Burning Tree does not expressly draw a distinction between the two types of associational rights. The club claims that it is seeking "First Amendment protection," which may suggest that it is relying on freedom of expressive association.[7] The club, however, alleges no infringement of the types of activities which freedom of expressive association protects. Rather, the club asserts that its "size, purpose, policies, selectivity, congeniality" and exclusivity imbue it with associational rights. These are the characteristics listed in the *Roberts* and *Rotary Club* opinions as relevant in determining whether a group may enjoy intimate associational rights which would protect the group from antidiscrimination legislation. Therefore, when analyzed, Burning Tree's argument would appear to be based on freedom of intimate association.

## A.

■ The Supreme Court has neither precisely defined the scope of freedom of intimate association nor delineated the sort of relationships which enjoy its protection. The Court has stated, however, that "[t]he personal affiliations that

---

6. In discussing the considerations that underlie this protection the Supreme Court has pointed to its earlier decisions protecting an individual's right to marry, *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); an individual's right to make decisions regarding childbearing, *Carey v. Population Services Intern.,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); a parent's right to direct the education of his or her children, *Smith v. Organization of Foster Families,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); and *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). *See also Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

7. There is language in Supreme Court opinions, however, indicating that freedom of intimate association may, to some extent, be grounded upon the First Amendment. *See Rotary Club, supra,* 481 U.S. at 546, 107 S.Ct. at 1946, 95 L.Ed.2d at 484; *Hishon v. King & Spalding,* 467 U.S. 69, 78, 104 S.Ct. 2228, 2235, 81 L.Ed.2d 59 (1984).

... suggest some relevant limitations on the relationships that might be entitled to this constitutional protection, are those that attend the creation and sustenance of a family." *Roberts, supra,* 468 U.S. at 619, 104 S.Ct. at 3250, 82 L.Ed.2d at 472. The Court added (468 U.S. at 619–620, 104 S.Ct. at 3250–3251, 82 L.Ed.2d at 472):

"Family relationships ... are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty."

How far the protection extends beyond familial relationships is unclear. In *Roberts,* the Court stated (468 U.S. at 620, 104 S.Ct. at 3251, 82 L.Ed.2d at 473):

"[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees.... Between these poles, of course, lies a broad range of human relationships that may have greater or lesser claims to constitutional protection from particular incursions by the State."

This language suggests that relationships should be viewed along a continuum from most to least intimate, with the most intimate associations afforded the greatest protection from government interference and the least intimate afforded lesser protection. *See* Note, *Private Club Membership —Where Does Privacy End and Discrimination Begin?,* 61 St. John's L.Rev. 474, 490 (1987).

In *Rotary Club, supra,* 481 U.S. at 545, 107 S.Ct. at 1946, 95 L.Ed.2d at 484, the Court noted that it had "not held that constitutional protection is restricted to relationships among family members." Nevertheless, in no case has the Court actually extended the protection beyond the scope of familial relationships. For example, in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the

Court held that a zoning ordinance which restricted occupancy of single-family dwellings to families or groups of no more than two unrelated persons did not infringe associational rights of six unrelated students who wanted to share a house. The Court said: "The ordinance places no ban on other forms of association, for a 'family' may, so far as the ordinance is concerned, entertain whomever it likes." *Village of Belle Terre v. Boraas, supra*, 416 U.S. at 9, 94 S.Ct. at 1541, 39 L.Ed.2d at 804.

In contrast, three years later, in *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), the Court invalidated a zoning ordinance which limited occupancy to members of a single family but which defined 'family' so as not to include a grandmother living with her two grandsons. The Court stated that the municipality's reason for the ordinance, namely the alleviation of overcrowding, was inadequate to justify the intrusion "on choices concerning family living arrangements." 431 U.S. at 499, 97 S.Ct. at 1936, 52 L.Ed.2d at 537. The Court's plurality opinion explicitly distinguished *Belle Terre*, saying: "The ordinance [in *Belle Terre*] affected only *unrelated* individuals.... East Cleveland, in contrast, has chosen to regulate the occupancy of its housing by slicing deeply into the family itself." 431 U.S. at 498, 97 S.Ct. at 1935, 52 L.Ed.2d at 537.

The Supreme Court in the *Rotary Club* case had little difficulty concluding that an anti-discrimination statute did not impair intimate associational rights. Despite the fact that Rotary membership was not open to the general public, and that the size of the local Rotary clubs varied widely, with some having fewer than 20 members, the Court pointed out that the Rotary Club's goal was to be inclusive, not exclusive, and to consistently grow in membership. Furthermore, the Club's activities were conducted publicly "rather than carrying on their activities in an atmosphere of privacy." *Rotary Club, supra*, 481 U.S. at 547, 107 S.Ct. at 1947, 95 L.Ed.2d at 485.

While the above-mentioned factors led the Court to conclude that the challenged provision did not impair the associational rights of Rotary Club members, the Court's opinion left unanswered whether an organization such as Burning Tree might enjoy associational protection where the Jaycees and Rotary Club did not. In arguing that it does enjoy the protection, Burning Tree points to its size, approximately 440 members, and its founding as a small group of congenial men devoted solely to the game of golf. The club argues that it is selective in that individuals may not apply to join the club but must be proposed and seconded for membership by current members. A prospective member's background is carefully screened, making the admission process last at least one year. More candidates are proposed for membership than are actually admitted. Finally, the club points to its policy prohibiting discussion of business matters on the premises and the absence of non-golf activities at the club. Consideration of these factors does not, however, lead to the conclusion that the associational rights of Burning Tree's members have been unconstitutionally infringed.

The size of Burning Tree's membership is not so small as to suggest that it is entitled to constitutionally protected intimate associational rights.[8] In *New York State Club Ass'n v. City of New York, supra,* the Supreme Court rejected a claim that New York City's Human Rights Law (N.Y.C.Admin.Code § 8–102(9) (1986)) was facially invalid. The law defined as a public accommodation subject to anti-discrimination provisions any club which "has more than four hundred members, provides regular meal service and regularly receives payment for dues, fees, use of space, facilities, services, meals or beverages directly or indirectly from or on behalf of nonmembers for the furtherance of trade or business." In discussing the statute, the Court

---

**8.** Although the exact size of the membership of the club is not evident from the record, it appears to be in excess of 440 members, including resident and non-resident members.

noted (—— U.S. at ——, 108 S.Ct. at 2233, 101 L.Ed.2d at 15):

> "The clubs that are covered under the Law contain at least 400 members. They thus are comparable in size to the local chapters of the Jaycees that we found not to be protected private associations in *Roberts*, and they are considerably larger than many of the local clubs that were found to be unprotected in *Rotary*, some which included as few as 20 members."

The evidence in the record with respect to the other factors is also less than compelling. The assertion that club policy prohibits the discussion of business matters is not a sufficient basis for concluding that such discussions in fact do not take place. As for selectivity, while it appears the club will not take just anyone, it is unclear what selective criteria are required for admission other than being a male interested in golf. In short, Burning Tree has not established that it qualifies for the intimate associational rights described in *Roberts* and *Rotary Club*.

Other courts have generally been reluctant to recognize constitutionally protected freedom of intimate association rights beyond family relationships. In *Concord Rod & Gun Club, Inc. v. MCAD*, 402 Mass. 716, 524 N.E.2d 1364, 1367 (1988), the Supreme Judicial Court of Massachusetts rejected a freedom of intimate association challenge to an administrative determination that a hunting and fishing club was a public accommodation subject to the state's anti-discrimination laws. The court applied the factors articulated in *Roberts* and *Rotary Club*, and concluded as follows:

> "The commissioner's findings leading to the conclusion that the Club does not have a selective process for admittance to membership establish with equal force that application of the anti-discrimination statute to the Club does not impair the members' rights of intimate association."

In *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal.3d 72, 219 Cal.Rptr. 150, 707 P.2d 212 (1985), the Supreme Court of California held that the Boys' Club, a private organization open to any boy but not to girls, did not enjoy intimate associational rights.

Commentators have differed somewhat as to the implications of *Roberts* and *Rotary Club* for various non-familial groups. One writer has stated (Comment, *Board of Directors of Rotary International v. Rotary Club of Duarte: Redefining Associational Rights*, 1988 B.Y.U.L.Rev. 141, 152–153):

> "Whether large, single-sex social organizations ... can be afforded protection as 'intimate associations' is no longer ... 'open to serious consideration.' Consequently, the freedom of 'expressive association' is now essentially the only available avenue for non-family type groups seeking constitutional protection."

Professor William P. Marshall, in *Discrimination and the Right of Association*, 81 Nw.U.L.Rev. 68, 82 (1986), pointed out that

> "few organizations are likely to merit protection as 'friendships' because the protectable interest does not derive from simple membership, acquaintance, or casual alliance. Even a small club with personal contact between all members is probably not sufficient to merit constitutional protection because the depth of commitment and strength of personal attachment between all members must be great to achieve any true semblance of intimacy." [9]

---

9. Professor Marshall goes on to argue that certain cultural affiliations, such as all-Irish or all-Jewish organizations, but not all-male organizations, should be protected, but states that "the organizations most likely to become the targets of state antidiscrimination efforts, such as civic, eating, service, athletic, and country clubs, are also the least likely to have a protectable constitutional interest." Marshall, *Discrimination and the Right of Association*, 81 Nw.U.L.Rev. 68, 84 (1986).

Other commentators take the position that some non-familial associations are protected. *See, e.g.,* Linder, *Freedom of Association after Roberts v. United States Jaycees,* 82 Mich.L.Rev. 1878, 1886 (1984). Thus, Professor Linder states that

> "a state university regulation prohibiting single-sex organizations would be constitutionally suspect as applied to college fraternities or sororities. State regulation of private bridge clubs ... probably would be of even more dubious constitutionality." *Ibid.*[10]

Whatever the scope of freedom of intimate association under the federal constitution, there is little support in cases or commentary for the notion that the right extends to a sizable, all-male organization devoted to playing golf. There is even less support for the idea that the right would extend to protect that type of organization from the sort of governmental interference complained of here. If relationships are viewed along a continuum from most to least intimate with the most intimate (*i.e.,* the family) having the greatest protection from interference by the State, we shall assume, for purposes of this case, that the Burning Tree Club is a more intimate organization than the Jaycees or Rotary, and that it may be protected from certain types of regulation which could be imposed upon the latter organizations. The particular government interference complained of here, however, is not as great as the interference at issue in *Roberts* and *Rotary Club.* In the present case, the State will simply withdraw a benefit from the club if it continues to discriminate, thereby placing the club on the same footing as comparably situated landowners. Under the case law dealing with organizations' claims of constitutionally

---

**10.** *But see,* Comment, *College Social Organizations,* 75 Calif.L.Rev. 2117 (1987), arguing that collegiate fraternities are not sufficiently intimate to warrant protection, and Note, *Private Club Discrimination Can Be Outlawed: Roberts v. United States Jaycees,* 19 U.S.F.L.Rev. 413, 425 (1985), stating, "it is unlikely that any membership organization could provide the relationships or activities of the intensely private nature protected by the freedom [of intimate association]."

protected intimate associational rights, Ch. 334 would not appear to burden unconstitutionally any intimate associational rights of Burning Tree's members.

## B.

 Burning Tree argues that the State is unconstitutionally withdrawing a benefit from the club, which is otherwise qualified to receive it, as a punishment for the club's exercise of its constitutional right of association. In making this contention, Burning Tree relies on two cases, *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In our view, and regardless of whether Burning Tree's argument is viewed as resting on freedom of expressive association or on freedom of intimate association, neither *Speiser* nor *Perry* supports Burning Tree's position.

In *Speiser*, the Supreme Court held unconstitutional California's practice of denying state tax exemptions to veterans who declined to take a loyalty oath. The exemptions were otherwise available to all veterans under California law. In striking down the California policy, the Court stated (357 U.S. at 519, 78 S.Ct. at 1338):

"[T]he denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech. The denial is 'frankly aimed at the suppression of dangerous ideas.' *American Communications Assn. v. Douds, supra* [339 U.S. 382] at 402 [70 S.Ct. 674, 686, 94 L.Ed. 925 (1972) ]."

In *Perry v. Sindermann, supra,* 408 U.S. at 597, 92 S.Ct. at 2697, the Court held that a state government could not refuse to renew a teacher's contract solely because of his protected speech outside the classroom, as a government

"may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the

government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall*, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)]. Such interference with constitutional rights is impermissible."

While these cases stand for the proposition that the government generally may not deny benefits to persons because of the content of their speech, they are obviously distinguishable from the present case. In both *Speiser* and *Perry*, the state's action had a direct, chilling effect on the content of an individual's speech. In this case, the government is merely removing a tax benefit because of the club's discriminatory policies. No First Amendment free speech right is involved in the present case. We are unaware of any decision suggesting that the reasoning of *Speiser* and *Perry* extends to circumstances like those now before us.

A more analogous case is *Green v. Connally*, 330 F.Supp. 1150 (D.D.C.), *aff'd* 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971). In *Green*, the United States District Court upheld the denial of tax-exempt status to racially discriminatory private schools against a challenge that the denial violated the schools' associational rights. The court distinguished *Speiser* in language equally applicable to the present situation (330 F.Supp. at 1166–1167):

"*Speiser* involved an affirmative requirement imposed as a condition of obtaining the tax exemptions provided for veterans by the state constitution. A statute made qualification for the exemption dependent on the filing of an oath that the applicant did not advocate the overthrow of the Government by force, violence or other lawful means. Although the statute was construed by the state court to deny exemptions only to claimants who engage in speech that may constitutionally be punished, it was enforced through procedures, placing the burdens of proof and persuasion on the taxpayers, that denied the procedural

safeguards required by the due process clause, and were held to interfere with the veterans' present freedom of speech.

"In the case before us exemptions and deductions would be denied not on account of beliefs and associations but on account of acts and practices constituting discrimination among students on account of race—acts contrary to a national policy that has constitutional ingredients. If schools sincerely terminate those harmful activities they may obtain the exemption. In *Speiser* the statutory scheme was offensive because it operated to chill speech that was permissible, because of fears that the veterans might be unable to establish its permissibility. It is not remotely suggested by intervenors that they fear lest their schools will undertake only activities that are innocent, *i.e.*, not racially discriminatory, yet be wrongly condemned as discriminatory. *Speiser* certainly does not hold that a government acts impermissibly in withholding tax benefits from one who engages in activities that are reasonably and constitutionally deemed contrary to the government's policy."

As in *Green*, the denial of tax benefits in the present case is not based on "beliefs and associations, but on account of acts and practices constituting discrimination."

Furthermore, the connection between the denial of a government benefit and the protected activity is not as direct in the present case as it was in *Perry* and *Speiser*. In those cases the government benefit was available as a matter of course to all similarly situated individuals. In *Speiser*, all veterans were entitled to the tax exemption; in *Perry*, teachers routinely retained their teaching positions. In both cases the denial of the government benefit left the plaintiffs substantially disadvantaged in comparison with those similarly situated. In the present case, the tax benefit which Burning Tree enjoys is not generally available to comparable landowners. Thus, the removal of Burning Tree's benefit, rather than uniquely disadvantaging Burning Tree, simply puts the club on an equal footing with

comparably situated landowners. The less direct the connection between the denied government benefit and the protected activity, the less likely it is that the denial violates the associational rights claimed by the party to whom the benefit is denied.

In *Regan v. Taxation With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), the Supreme Court upheld the Internal Revenue Service's denial of tax-exempt status to organizations engaged in lobbying, rejecting Taxation With Representation's argument that the IRS's action denied the organization a benefit because of the exercise of First Amendment rights. The Court specifically distinguished *Speiser* and *Perry*, saying (461 U.S. at 545, 103 S.Ct. at 2001):

"TWR is certainly correct when it states that we have held that the government may not deny a benefit to a person because he exercises a constitutional right. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). But TWR is just as certainly incorrect when it claims that this case fits the *Speiser–Perry* model. The Code does not deny TWR the right to receive deductible contributions to support its non-lobbying activity, nor does it deny TWR any independent benefit on account of its intention to lobby. Congress has merely refused to pay for the lobbying out of public moneys."

As in *Regan*, the State in the present case is not punishing or prohibiting the exercise of any associational rights which Burning Tree's members might possess. The State is simply declining to subsidize any organization that engages in certain discriminatory activities. Just because Burning Tree's members may have associational rights does not oblige the State to subsidize the exercise of those rights.[11]

---

11. *Lyng v. International Union, UAW*, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), reiterates this principle. In *Lyng* the Court upheld an amendment to the federal Food Stamp Act which denied food stamps to households where a member was on strike. The amend-

■ Other cases also support the view that a private entity's protected associational rights do not entitle the entity to government subsidies or endorsement of its activities. In *Hishon v. King & Spalding*, 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984), the Supreme Court rejected a claim that applying Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, to a law firm's hiring practices would infringe the firm members' rights of association, saying: "Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been afforded affirmative constitutional protection," quoting *Norwood v. Harrison*, 413 U.S. 455, 470, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973). In *Norwood* itself the Court rejected an argument that Mississippi was required to provide the same amount of assistance to private schools that it provided to public schools, regardless of whether the private schools practiced racial discrimination. The Court said (413 U.S. at 462–463, 93 S.Ct. at 2809):

"[A] State's special interest in elevating the quality of education in both public and private schools does not mean that the State must grant aid to private schools

---

ment was challenged as denying union members' freedom of association. The Court rejected the challenge saying, "the strikers' right of association does not require the Government to furnish funds to maximize the exercise of that right." 108 S.Ct. at 1190. The Court distinguished cases in which it had found that state practices violated First Amendment associational rights, as in *NAACP v. Alabama ex. rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). The Court said (485 U.S. at ——, 108 S.Ct. at 1190 n. 5, 99 L.Ed.2d at 389 n. 5):

"Exposing the members of an association to physical and economic reprisals or to civil liability merely because of their membership in that group poses a much greater danger to the exercise of associational freedoms than does the withdrawal of a government benefit based not on membership in an organization but merely for the duration of one activity that may be undertaken by that organization."

In the instant case, the government benefit is being denied, not because of membership in an organization, but because of Burning Tree's current discriminatory practices.

without regard to constitutionally mandated standards forbidding state-supported discrimination. That the Constitution may compel tolerance of private discrimination in some circumstances does not mean that it requires state support for such discrimination."

These cases make it clear that governments are under no obligation to sanction, subsidize or support discrimination by private entities, and that the failure to subsidize discriminatory entities does not unconstitutionally burden their associational rights.

■ Finally, to whatever extent the State's denial of a preferential tax assessment is viewed as a burden on Burning Tree's members' rights of association, the State has a compelling interest justifying the imposition of such a burden. The Supreme Court has recognized that restricting associational rights "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. United States Jaycees, supra,* 468 U.S. at 623, 104 S.Ct. at 3252.

In *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), the Supreme Court upheld the Internal Revenue Service's denial of tax-exempt status to racially discriminatory religious schools, saying, "the Government has a fundamental, overriding interest in eradicating racial discrimination in education.... That governmental interest substantially outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs." 461 U.S. at 604, 103 S.Ct. at 2035, 76 L.Ed.2d at 181.

The State of Maryland, as reflected in its Equal Rights Amendment and the numerous cases construing it, has made a commitment to equal rights for women which elevates the goal of eliminating state supported sex discrimination to a compelling state interest. That compelling interest outweighs whatever burden this tax assessment legislation

may have imposed on Burning Tree's associational rights. Furthermore, the State's method of satisfying its interest is narrowly tailored to fulfill that purpose and is no more restrictive of associational freedoms than is necessary.

## V.

We now turn to Burning Tree's E.R.A. challenge to Ch. 334. Burning Tree asserts that it has standing to bring this challenge under the E.R.A., that the periodic discrimination provision of Ch. 334 violates the E.R.A., and that that provision is not severable from Ch. 334's prohibition against sex discrimination. The State argues that Burning Tree lacks standing to bring an E.R.A. challenge, that the periodic discrimination provision does not violate the E.R.A., and that, if it does, the provision is severable from the remainder of Ch. 334. We agree with Burning Tree that it has standing to bring the challenge and that the periodic discrimination provision violates the E.R.A. We agree with the State, however, that the provision is severable from the remainder of Ch. 334.

## A.

The State maintains that neither Burning Tree nor its individual members have standing to raise an E.R.A. challenge. First, the State reasons that the E.R.A. creates purely personal rights which cannot be asserted by a corporation like Burning Tree. Second, the State argues that the club and its individual members lack standing as taxpayers because they suffer no direct injury from the periodic discrimination provision. According to the State, Burning Tree and its members are trying to "leapfrog" or "bootstrap" standing in the hope that, if the periodic discrimination provision is ruled unconstitutional, it will also be held not severable from the remainder of the statute.

With regard to the State's argument that a corporation cannot bring an E.R.A. claim other than in its capacity as a taxpayer, it has been said that whether constitutional protections are available to corporations as well as individuals

"depends on the nature, history, and purpose of the particular provision." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 779 n. 14, 98 S.Ct. 1407, 1416–1417 n. 14, 55 L.Ed.2d 707 (1978). We note that this Court has entertained E.R.A. challenges brought by corporate entities. *See Condore v. Prince George's County,* 289 Md. 516, 425 A.2d 1011 (1981); *Massage Parlors, Inc. v. City of Balto,* 284 Md. 490, 398 A.2d 52 (1979). In neither of those cases, however, was the question of standing raised before this Court. Because the parties in this case include two individual members of Burning Tree, who can certainly raise an E.R.A. challenge, and because we hold that both Burning Tree and its members have taxpayer standing to challenge Ch. 334, we need not decide whether the club would otherwise have standing to bring this suit.

Under Maryland law, the doctrine of taxpayer standing is not as narrowly limited as it is under the law of some jurisdictions.[12] "In Maryland, taxpayers have standing to bring suit to challenge the constitutionality of a statute when the statute as applied increases their taxes." *Murray v. Comptroller,* 241 Md. 383, 391, 216 A.2d 897, 901, *cert. denied,* 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966). *See Inlet Associates v. Assateague House,* 313 Md. 413, 440–441, 545 A.2d 1296, 1310–1311 (1988). In the instant case the State, acting pursuant to Ch. 334, has taken steps to increase the tax liability of Burning Tree by over $300,000. Clearly, Ch. 334 as applied increases Burning Tree's tax burden.

The State argues, however, that Burning Tree and its members lack standing because, according to the State, they suffer no direct tax injury from the challenged periodic discrimination provision. The State's position is factually incorrect. Burning Tree's tax burden is, indeed, greater as a result of the allegedly unconstitutional tax exemptions

---

12. *Cf. United States v. Richardson,* 418 U.S. 166, 180, 94 S.Ct. 2940, 2948, 41 L.Ed.2d 678 (1974) (Powell, J., concurring); *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

granted to other country clubs by the periodic discrimination provision. *See, e.g., Murray v. Comptroller, supra,* 241 Md. at 391, 216 A.2d at 901–902, in which a taxpayer was accorded standing to challenge allegedly unconstitutional tax exemptions given to others.

 More generally, there is no requirement in Maryland law that the tax injury suffered in order to gain taxpayer standing must flow directly from the challenged portion of the statute. The State cites no Maryland case holding that a taxpayer, whose tax burden is increased by a statute, lacks standing to challenge that statute in its entirety when the allegedly unconstitutional portion does not, by itself, directly increase his tax burden.

Our decisions have not required the close nexus between the challenged portion of a statute and the tax burden incurred by the plaintiff which the State argues for here. All that we have required is that the taxpayers' tax burden be increased, or even threatened to be increased, by the challenged law.

Somewhat analogous to the present case is *Citizens Planning and Housing Ass'n v. County Executive,* 273 Md. 333, 329 A.2d 681 (1974), in which taxpayers were held to have standing to challenge the County Executive's reorganization of the Office of Planning and Zoning. The plaintiffs alleged that the county executive's acts violated the separation of powers provision in a county's charter. This Court accorded them standing even though they were clearly not directly injured by the county executive's alleged violation of separation of powers. Rather they were indirectly injured in that the county executive's alleged violation arguably led to inefficient government operations, thereby raising taxes. *See also James v. Anderson,* 281 Md. 137, 377 A.2d 865 (1977).

Similarly, in *Gordon v. Baltimore,* 258 Md. 682, 267 A.2d 98 (1970), this Court held that a taxpayer had standing to challenge Baltimore City's acceptance of library books in violation of the terms of a gift. Even though the plaintiff

was not directly affected by the illegal act, he was given standing because the City's action might increase his tax burden.

The cases in this Court generally stand for the principle that a taxpayer has standing to challenge a statute's constitutionality upon a showing that the statute, as applied, actually or potentially increases the plaintiff's tax burden. Therefore, Burning Tree has standing to challenge the periodic discrimination provision.

### B.

The E.R.A. states: "Equality of rights under the law shall not be abridged or denied because of sex." In deciding whether Ch. 334 violates the E.R.A., we employ an analysis similar to that used in *Burning Tree Club v. Bainum, supra.* We must first determine whether state action is present and, if so, whether the periodic discrimination provision abridges equality of rights on the basis of sex.

All of the opinions in *Burning Tree v. Bainum* took the position that a finding of state action is necessary in order for there to be a violation of the E.R.A. 305 Md. at 73, 501 A.2d at 827 (Murphy, C.J.), 305 Md. at 86, 501 A.2d at 833–834 (Rodowsky, J.), 305 Md. at 90, 501 A.2d at 836 (Eldridge, J.). The State suggests that " 'state action' is more difficult to find" in the enactment of Ch. 334 because Ch. 334 "does not confer a tax break 'pursuant to a statutorily created state administrative proceeding, in which it is determined that the private party is engaged in statutorily sanctioned sex discrimination.' " (State's brief, p. 25).

In *Bainum,* however, a majority of this Court took the position that the enactment of legislation which on its face draws classifications based on sex is state action sufficient to invoke the E.R.A. Thus, Judge Rodowsky wrote: "[T]he General Assembly has included in Ch. 870 a prohibition against discrimination based on sex. That legislation is state action. Obviously the equality 'under law' which the

E.R.A. guarantees embraces an enactment by the General Assembly." 305 Md. at 86, 501 A.2d at 833–834. Similarly, Judges Eldridge, Cole and Bloom expressed the view that "Ch. 870 on its face expressly draws classifications which implicate the E.R.A." 305 Md. at 92, 501 A.2d at 837. Ch. 334 in this case, as did Ch. 870 in *Bainum*, draws explicit distinctions based on sex. The statute distinguishes between sex discrimination and other types of discrimination, as well as between periodic gender-based discrimination and total gender-based discrimination. Thus, the enactment of Ch. 334 is itself state action.

As to whether the periodic discrimination provision abridges equality of rights because of sex, the analytically indistinguishable *Bainum* case, once again, is our guidepost. In that case Judge Rodowsky found the primary purpose provision unconstitutional on its face because it "single[d] out for special exception from an otherwise uniformly applicable anti-discrimination measure private discrimination of a certain type—sex—and to a certain degree —total—which neither the State nor a private club receiving a tax exemption could otherwise practice." 305 Md. at 85, 501 A.2d at 833. Judges Eldridge, Cole and Bloom expressed the same view, stating that Ch. 870 was fatally flawed in drawing

> "an express distinction between race, color, creed and national origin discriminations on the one hand, and sex discrimination on the other hand. It also expressly distinguishes between two types of sex discrimination, allowing sex discrimination when it is the 'primary purpose' of the club and disallowing it in other situations." 305 Md. at 92, 501 A.2d at 837 (Eldridge, J.).

Ch. 334 fails in exactly the same way that Ch. 870 did. On its face Ch. 334 makes classifications using sex as a factor. First, the statute distinguishes between sex discrimination and other types of discrimination. Second, the statute creates a classification that distinguishes between discrimination on the basis of sex which is periodic (permitted) and discrimination on the basis of sex which is total

(prohibited). Indeed, Judge Rodowsky's opinion in *Bainum* expressly stated that the periodic discrimination provision was invalid for the same reasons as the primary purpose provision. 305 Md. at 87, 501 A.2d at 834.

As the earlier *Bainum* case made clear, the burden of justifying these classifications falls upon the State. The level of scrutiny to which the classifications are subject is "at least the same scrutiny as racial classifications." 305 Md. at 98, 501 A.2d at 840). The State's justifications for the statute are that: (1) there has been no showing that "a substantial discrimination" is at issue; (2) the periodic discrimination provision permits such activities as "all-male or all-female member guest tournaments and professional-amateur tournaments for women or men only"; and (3) physical differences between men and women might affect the speed of their respective golf games, thereby justifying separate playing times in order to maximize efficient use of the golf facilities. (State's brief, pp. 23–28).

The State's first argument is without merit. The "periodic discrimination" provision, on its face, permits the segregation of facilities on the basis of sex. Plainly, under prior holdings of this Court, state action providing for segregation based upon sex, absent substantial justification, violates the E.R.A., just as segregation based upon race violates the Fourteenth Amendment. *See Burning Tree Club v. Bainum, supra,* 305 Md. at 95–98, 501 A.2d at 838–840. We reject the State's views that only a "substantial" discrimination requires justification of the State, and that there was no substantial discrimination shown in this case. Any statute which discriminates on the basis of sex requires justification. The E.R.A. "absolutely forbids the determination of such 'rights,' as may be accorded by law, solely on the basis of one's sex." *Burning Tree Club v. Bainum, supra,* 305 Md. at 70, 501 A.2d at 825 (Murphy, C.J.).

The State's arguments that Ch. 334 is justified because it permits all-male and all-female sports events and because it recognizes distinctions in the golf abilities of men and

women are also unpersuasive. We need not here decide whether single-sex golf tournaments or similar practices, which the State would deem insubstantial, are permissible under the E.R.A. Nothing in the statute narrowly confines the permitted sex discrimination to such practices. In fact, single-sex golf tournaments may not even be encompassed by the periodic discrimination provision, which relates to excluding members of one sex on a "day" or "time" basis but not an "event" basis. The statute, on its face, permits a club to engage in periodic sex discrimination in any of its facilities for any reason at all. It would permit the exclusion of women, for example, on four or five days of the week, just so the exclusion is not for all seven days. In order to justify a racially or sexually discriminatory statute, it is not enough for the State to claim legitimate interests which it seeks to further. Under strict scrutiny, legislation must be narrowly tailored and precisely limited to achieving those legitimate ends. In an equal protection context, the Supreme Court said in *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972):

> "It is not sufficient for the State to show … a very substantial state interest. In pursuing that important interest the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with precision … and must be 'tailored' to serve their legitimate objectives.… And, if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference."

Consequently, we conclude that the periodic discrimination provision of Ch. 334 violates the E.R.A.

## C.

■ The final issue is whether the periodic discrimination provision is severable from the remainder of Ch. 334. Resolving questions of severability "involves ascertaining what would have been the intent of the Legislature had the

partial invalidity been known." *Burning Tree Club v. Bainum, supra*, 305 Md. at 82, 501 A.2d at 832 (Murphy, C.J.). Certain principles are pertinent in determining that intent. One is the strong presumption "that a legislative body generally intends its enactments to be severed if possible." *O.C. Taxpayers v. Ocean City*, 280 Md. 585, 600, 375 A.2d 541, 550 (1977). *See also Turner v. State*, 299 Md. 565, 576, 474 A.2d 1297, 1303 (1984); *Cities Service Co. v. Governor, supra*, 290 Md. at 575, 431 A.2d at 675. A second principle is that, "when the dominant purpose of a statute may largely be carried out notwithstanding the invalid provision, courts will ordinarily sever the statute and enforce the valid portion." *Davis v. State*, 294 Md. 370, 384, 451 A.2d 107, 114 (1982). *See also, Turner v. State, supra; Cities Service Co. v. Governor, supra.*

In *Burning Tree Club v. Bainum, supra*, the majority concluded that it was not "the dominant purpose of the General Assembly . . . to enact a bar against sex discrimination which was to operate absent the primary purpose provision." 305 Md. at 83, 501 A.2d at 832. The legislative history of Ch. 334, on the other hand, clearly shows that the "dominant purpose" of the General Assembly in enacting Ch. 334 was to reinstate sex as a prohibited basis for discrimination, regardless of the validity of the periodic discrimination provision.

Ch. 334 was introduced as S.B. 483 by Senator Bainum, a plaintiff in the *Burning Tree Club v. Bainum* case. As initially introduced the bill restored the language prohibiting sex discrimination which this Court struck down in *Bainum*. There was originally no periodic discrimination provision. On February 28, 1986, the Attorney General's office wrote to Senator Bainum in response to his request for an opinion as to the constitutionality of a bill containing the periodic discrimination provision. The Attorney General's letter stated that S.B. 483 would not be rendered unconstitutional by the periodic discrimination provision. The Attorney General reasoned that

"the 'periodic discrimination' provision was not challenged in the [*Bainum*] litigation and thus was not declared invalid. Thus, presumably it is still a part of existing law—although in a dormant state because it is an exception to a ban on sex discrimination that has been declared invalid and presently unenforceable. The proposed amendment to Senate Bill 483 would not reintroduce into the law the 'periodic discrimination' provision. It would simply leave in the law a provision that is already there and that has not yet been definitely judicially scrutinized."

Although the Attorney General's analysis of *Bainum's* disposition of the periodic discrimination provision was incorrect,[13] the General Assembly did follow the Attorney General's advice. This shows that the inclusion of the periodic discrimination provision, rather than a dominant legislative purpose, was simply intended to be a reenactment of "a provision that is already there."

In a favorable Committee Report on Senate Bill 483, which became Ch. 334, the Bill's purpose was described as

"reinstat[ing] in the law the prohibition on sex discrimination by country clubs who receive the preferred country club assessment on their real property. The bill does this by removing the exemption to the prohibition. This exemption to the prohibition is that the primary purpose of the clubs may be ... serving or benefiting members of a particular sex.

"Last December the Court of Appeals utilizing the severability concept struck down the prohibition on discrimination on account of sex, because it had the exemption for country clubs. This is the severability concept used by the courts, and it is the subject addressed in this bill."

---

**13.** Chief Judge Murphy's opinion in *Bainum,* announcing the judgment of the Court, pointed out that the periodic discrimination provision of Ch. 870 fell, along with the primary purpose provision and the ban on sex discrimination. 305 Md. at 84, 501 A.2d at 832.

This statement makes clear that the dominant purpose of the enactment was restoring the prohibition against sex discrimination. The failure to mention the periodic discrimination provision in the Report confirms that the General Assembly did not view the provision as an important addition.

In a May 7, 1986, letter from the Attorney General to the Governor, prior to his signing Ch. 334 into law, the Attorney General expressed the view that the periodic discrimination provision would be severable. The Attorney General reiterated his view as to the *Bainum* decision's effect on the periodic discrimination provision and stated as follows (emphasis added):

"This letter [of Feb. 28] was distributed to members of the Senate Budget and Taxation Committee and the Counsel to the General Assembly appeared before the Committee on February 28, 1986 to explain the advice. At that time, *the Committee Chairman specifically asked whether Senate Bill 483 would be severable from the periodic discrimination exemption and was advised that it would be.* The severability issue was also raised when Senate Bill 483 was before the House Ways and Means Committee ... as members debated whether an amendment to the bill was needed to insure its constitutionality.... After the February 28, 1986 letter of advice was distributed to committee members, the decision was apparently reached that it was not necessary to amend the bill or add a severability clause....

\* \* \* \* \* \*

"In light of this legislative history, it is our opinion that Senate Bill 483 is constitutional and would be severable from the periodic discrimination provision of § 8–214...."

The General Assembly's being informed that the periodic discrimination provision would be severable, further buttresses the conclusion that the dominant purpose of Ch. 334 was to prohibit sex discrimination, regardless of the presence or absence of the periodic discrimination provision.

We hold, therefore, that the periodic discrimination provision is invalid and severable. The prohibition against sex discrimination in § 8–214 of the Tax–Property Article remains viable and applicable to Burning Tree.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED, AND CASE REMANDED TO THAT COURT FOR THE ISSUANCE OF A DECLARATORY JUDGMENT IN ACCORDANCE WITH THIS OPINION. PLAINTIFFS TO PAY COSTS.

McAULIFFE, Judge, dissenting.

## I.

Burning Tree contends in this case, contrary to its original position in *Burning Tree Club v. Bainum,* 305 Md. 53, 501 A.2d 817 (1985) (*Burning Tree I*) that the so-called "periodic discrimination" provision violates the E.R.A. It does so in light of the majority view of *Burning Tree I* that the "periodic discrimination" provision violated the E.R.A. Of course, Burning Tree's position in this respect is taken, not from conviction that *Burning Tree I* was correct, but rather to lay the underpinning for its argument that the "periodic discrimination" provision cannot be severed from the remainder of Chapter 334 and, hence, the entire act is unconstitutional.

The E.R.A. declares that "[E]quality of rights under the law shall not be abridged or denied because of sex." I agree with the position taken by Chief Judge Murphy in announcing the judgment of the Court in *Burning Tree I,* in which Judges Smith and Orth concurred. There, he recognized that the E.R.A. was prompted by the long history of denial of equal rights for women. The E.R.A., he said, "flatly prohibits gender-based classifications, either under legislative enactments, governmental policies, or by application of common law rules, in the allocation of benefits, burdens, rights and responsibilities as between men and women." 305 Md. at 64, 501 A.2d 817. He pointed out that our cases, and those of other jurisdictions having

similar E.R.A. provisions in their constitutions, clearly indicate that they prohibit *unequal* treatment imposed by law as between the sexes. *Id.* at 70, 501 A.2d 817. He noted that these cases shared a common thread—"they generally invalidate governmental action which imposes a burden on one sex but not the other, or grants a benefit to one but not the other." *Id.* The equality between the sexes mandated by the E.R.A., he said, is of "rights" of individuals "under the law," as to which the E.R.A. absolutely forbids their determination solely on the basis of one's sex. *Id.* In this formulation there must be a denial or abridgement of equal rights under the law as between men and women, absent which the E.R.A. has no application.

In enacting Chapter 334, and including the "periodic discrimination" provision as an exception to the general proscription against sex discrimination in the granting by country clubs of "membership and guest privileges," the legislature manifestly determined that it was not inconsistent with the E.R.A. or with the general prohibition against sex discrimination, to permit, on an equal basis, the exclusion of one sex, or the other from the club's activities or facilities "on specific days or at specific times." The obvious purpose of this provision—one of long duration in the operation of country clubs which antedates by many years the enactment of the E.R.A.—is to permit country clubs participating in the open space program to hold "men's or women's golf or tennis tournaments, or to ... [permit] men's or women's days or times on the course or courts, or to otherwise ... [permit] the continuance of time allocations that traditionally had been treated as reasonable and nondiscriminatory even though based on sex classification." Plainly the exception does not smack of a nefarious state-sponsored scheme to invidiously discriminate against men or women solely on account of their sex; it simply does not apportion or distribute benefits or burdens unequally among the sexes within the contemplation of the E.R.A.

Of course, I recognize that a statutory provision, although couched in gender neutral terms, may be applied in

an *invidiously* discriminatory manner and thus constitute a violation of the E.R.A. While I agree with the Court that the provision could have been more narrowly and artfully drawn, it is not *facially* at odds with the E.R.A. In my view, neither the legislature in proposing the E.R.A. or the people in adopting the amendment ever dreamed that it would be taken to such extreme lengths as to, in effect, virtually mandate a form of "togetherness" desired by neither sex. Such an interpretation, I think may well threaten to undermine the continuing acceptance of the E.R.A. itself, a dreadful result indeed.

## II.

If the "periodic discrimination" provision is unconstitutional, I do not agree that it is severable from the remainder of the statute.

The majority recites, and then relies upon, the principle that "a legislative body generally intends its enactments to be severed if possible." Majority opinion at [297]. That is a valid principle, and it is backed up by Article 1, § 23, Maryland Code (1957, 1987 Repl.Vol.). What the majority here apparently overlooks, but what a different majority did not overlook in *Burning Tree I*, is that the principle does not apply when the invalid portion of a statute is an exception to a prohibition.

A long established principle of statutory construction in determining severability questions, is that where the Legislature enacts a prohibition with an excepted class, and a court finds that the classification is constitutionally infirm, the court will ordinarily not presume that the Legislature would have enacted the prohibition without the exception, thereby extending the prohibition to a class of persons whom the Legislature clearly intended should not be reached. *Burning Tree I,* 305 Md. at 82 [501 A.2d 817], quoting from *State v. Schuller,* 280 Md. 305, 319, 372 A.2d 1076 (1977).

To the same effect, *see* 2 Sutherland *Statutory Construction* § 44.13 (4th ed.), stating:

When an exception, exemption, proviso, or any clause which limits the scope of an act's applicability is found to be invalid, the entire act may be void on the theory that by striking out the invalid exception the scope of the act has been widened and therefore cannot properly represent the legislative intent. To extend the scope of an act's operation by invalidating a provision of limitation while allowing the remainder to continue in effect invites criticism on the ground that it amounts to judicial legislation. (footnotes omitted).

During the 1988 session of the General Assembly, after this Court had made clear that this was the law followed in Maryland, House Bill 844 was introduced to amend Art. 1, § 23 of the Maryland Code by adding the following language:

The presumption of severability of statutes under this section applies even if the invalid portion of a statute is an exception to a prohibition.

The bill did not pass. The law remains as it was. The first part of ch. 334 constituted a general prohibition of the practice of discrimination. The second part may be considered an exception to the general prohibition. There is, therefore, no presumption of severability in this case.

The presumption, even when applicable, serves only as an aid in determining probable legislative intent. And, as this Court pointed out in *O. C. Taxpayers v. Ocean City*, 280 Md. 585, 375 A.2d 541 (1977), we look not to the actual intent of the legislature in passing the statute, but rather to what would have been the intent of the legislative body if it had known that the statute could be only partially effective. In the context of the case before us, the question is whether the legislature would have imposed the absolute ban of the first section of the statute had it known that the exception in the second section would be declared invalid. I cannot say with any confidence that the legislature would have done so, and therefore I decline to legislate by the scalpel of severance.

I am struck by the fact that when the legislature considered ch. 334 in 1986, it had just been through this entire exercise with the same statute. By ch. 870 of the Acts of 1974, the legislature had imposed upon participating country clubs a general prohibition against discrimination, immediately followed by exceptions for clubs primarily intending to benefit a particular sex, and clubs which excluded certain sexes only on certain days and at certain times. On December 23, 1985, just prior to the opening of the 1986 session of the General Assembly, this Court held the primary purpose exception was unconstitutional and, specifically stating that the Court would not indulge a presumption of severability when the invalidated statute was an exception to a general prohibition, refused to sever. The Court said that "severing the primary purpose provision would make the prohibition against sex discrimination operate as to single-sex country clubs and thereby enlarge [the] prohibition beyond its reach as enacted." *Burning Tree I*, 305 Md. at 82, 501 A.2d 817. Six weeks later, the bill we now consider was introduced. It is inconceivable to me that the legislature could have misunderstood the clear language of *Burning Tree I* when it set about "fine tuning" the exception in an effort to make it constitutional. The legislature did not make a radical change in an effort to escape this Court's decision of non-severability. Quite the contrary, it employed the same approach it had previously taken, simply deleting the primary purpose clause from the exception. If ever a legislative body had a right to believe that if its second attempt at defining an exception also proved lacking, it simply would be sent back to the drafting board, and not suffer the enactment of a prohibition far more sweeping than it had approved, it was the General Assembly of 1986.

The exception in Chapter 334 was intended, I believe, to be an integral part of the bill. Its genesis does not date to the drafting of the 1986 Act, but to a Senate amendment to the 1974 Act. The legislators apparently did not wish to pass a bill that would preclude country clubs from holding men's or women's golf or tennis tournaments, or from

establishing men's or women's days or times on the course or courts, or to otherwise proscribe the continuation of time allocations that traditionally had been treated as reasonable and non-discriminatory even though based on sex classification. When the 1974 Act was declared unconstitutional, and Senate Bill 483 was introduced, the exception was included in the original draft. Constituents then reminded their representatives of the need for the exception.[1] The Senate Budget and Taxation Committee Floor Report assured the membership that passage of the bill would not affect the ability of the clubs to "have such activities as men's/women's days or tournaments." Every member of the 1986 General Assembly voting for Senate Bill 483 had the right to assume that the bill would either survive as a whole or fail as a whole, and to be confident that we would not rewrite their legislation into the unlimited prohibition they had twice attempted to avoid.

The method by which the legislature structured the exception is also significant. It did not say, as the majority suggests by the use of the term "periodic discrimination," that discrimination was generally proscribed but that certain discrimination would be permitted. Instead, the legislature proscribed discrimination based on sex, and then defined discrimination so as not to include exclusion of either sex on specific days or at specific times. The prohibition of "discrimination based on sex" in subsection (a) is no broader than the specific definition of that term contained in subsection (b). I can think of no more obvious way to change the intent of the legislature than to judicially excise the limiting definition while leaving the balance of the statute intact.

Whether the legislature would have enacted Senate Bill 483 with no limiting definition of what it meant by sexual

---

1. *See, e.g.,* the letters of Doctor Luther Gray, past president of Congressional Country Club, and Mr. Jerome Powell on behalf of the Chevy Chase Club, contained in the record of the legislative history of Senate Bill 483, Department of Legislative Reference.

discrimination is entirely conjectural. The system of property tax assessment agreements that this legislation would affect is obviously perceived as beneficial to the State and its political subdivisions. In addition to the preservation of open spaces, there are obvious economic advantages that I believe the legislature could find significantly outweigh the tax concessions made. The history of this legislation indicates that the General Assembly did not wish to impose unnecessary and unwanted restrictions on country clubs, or to unnecessarily disturb an arrangement that is of benefit to the State. My best judgment is that if made aware the exception was overly broad, the legislature would have attempted to spell out an exception that would largely comport with existing practices of the country clubs and at the same time satisfy this Court's legitimate concern with overbreadth. I cannot say with any measure of confidence that the legislature would have passed this bill without the definition subsection that spelled out its true intent, and I therefore respectfully dissent from the holding that the statute is severable.

MURPHY, C.J., joins in this opinion.